Joyce W. Lindauer
State Bar No. 21555700
Jeffery M. Veteto
State Bar No. 24098548
Joyce W. Lindauer Attorney, PLLC
12720 Hillcrest Road, Suite 625
Dallas, Texas 75230
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
ATTORNEYS FOR DEBTORS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **REVOLUTION MONITORING, LLC** | § | **CASE NO. 18-33730-hdh** |
| | § | |
| | § | |
| **REVOLUTION MONITORING** | § | **CASE NO. 18-33731-hdh** |
| **MANAGEMENT LLC,** | § | |
| | § | |
| **REVOLUTION NEUROMONITORING LLC** | § | **CASE NO. 18-33732-hdh** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |

## SECOND JOINT PLAN OF REORGANIZATION FOR REVOLUTION MONITORING, LLC, REVOLUTION MONITORING MANAGEMENT, LLC AND REVOLUTION NEUROMONITORING, LLC DATED JULY 11, 2019

**TO: ALL PARTIES-IN-INTEREST, THEIR ATTORNEYS OF RECORD AND TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

COME NOW, Revolution Monitoring, LLC, Revolution Monitoring Management, LLC and Revolution Neuromonitoring, LLC (collectively "Debtors") in the above-referenced bankruptcy cases and propose the following Second Joint Plan of Reorganization ("Plan"). The Plan proposes segregation of the Creditors and Equity Interest Holders of the Debtors into separate classes.

## ARTICLE 1
## DEFINITIONS

Unless the context otherwise requires, the following capitalized terms shall have the meanings indicated when used in this Plan, which meaning shall be equally applicable to both the singular and plural forms of such terms. Any term in this Plan that is not defined herein but

that is used in title 11, United States Code ("Code") shall have the meaning assigned to such term in the Code.

1.    "**Accounts Receivable**" and "**Medical Receivables**" shall mean any and all right, title or interest of the Debtors in unpaid claims for medical services rendered or goods delivered, against any entity or individual that may be liable on such claim, whether such claim is contingent, liquidated, disputed or partially paid.

2.    "**Administrative Claim**" shall mean those Claims entitled to priority under the provisions of Section 507 of the Code, pursuant to a claimed and allowed administrative expense priority under Section 503(b) of the Code. However, ad valorem tax authorities shall not be required to file an administrative expense claim and request for payment in order for their administrative expense claims to be allowed pursuant to 11 U.S.C. Section 503(b)(1)(D).

3.    "**Allowed Claim**" as to all Classes, hereinafter specified, shall mean a Claim against Debtor (a) for which a Proof of Claim has been timely filed with the Court by the Bar Date, or, with leave of the Court and without objection by any party-in-interest, late-filed and as to which neither the Debtor nor any party-in-interest files an objection or as to which the Claim is allowed by Final Order of the Court, or (b) scheduled in the list of creditors, as may be amended, prepared and filed with the Court pursuant to Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, as to which no objection to the allowance thereof has been interposed through closing of this case, or as to which any such objection has been determined by an order or judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending. This category includes all Claims deemed unsecured pursuant to §506(a) of the Code. When "Allowed Claim" is used in the context of a Secured Claim, the provisions of §506(b) of the Code shall also apply.

4.    "**Allowed Secured Claim**" shall mean an Allowed Claim secured by a lien, security interest, or other encumbrance on the properties owned by the Debtor, which lien, security interest, or other encumbrance has been properly perfected as required by law, to the extent of the value of the property encumbered thereby. That portion of such Claim exceeding the value of the security held therefor shall be an Unsecured Claim, as defined below and determined pursuant to 11 U.S.C. §506(a).

5.    "**Allowed Unsecured Claim**" shall mean an unsecured Claim against Debtor (a) for which a Proof of Claim has been timely filed with the Court by the Bar Date, or, with leave of the Court and without objection by any party-in-interest, late-filed and as to which neither the Debtor nor any party-in-interest files an objection or as to which the Claim is allowed by Final Order of the Court, or (b) scheduled in the list of creditors, as may be amended, prepared and filed with the Court pursuant to Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, as to which no objection to the allowance thereof has been interposed through closing of this case, or as to which any such objection has been determined by an order or judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending. This category includes all Claims deemed unsecured pursuant to §506(a) of the Code.

6.     **"Bar Date"** shall mean the date fixed by the Court as the last date for filing all Claims in this case other than Administrative and Priority Claims or Rejection Claims.

7.     "**Billing Cycle**" is one calendar month.

8.     **"Case"** shall mean this Chapter 11 case.

9.     **"Claim"** shall mean any right to payment from the Debtor as of the date of entry of the Order Confirming Plan whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or can be asserted by way of set-off.  Claim includes any right or cause of action based on a pre-petition monetary or non-monetary default.

10.     **"Claimant"** shall mean the holder of a Claim.

11.     **"Class"** shall refer to a category of holders of Claims or interests which are "substantially similar" as provided for in Section 1122 of the Code.

12.     **"Code"** shall mean the United States Bankruptcy Code, being title 11 of the United States Code, as enacted in 1978 and thereafter amended.

13.     **"Confirmation"** or **"Confirmation of this Plan"** shall mean entry by the Court of an Order confirming this Plan at or after a hearing pursuant to Section 1129 of the Code.

14.     **"Confirmation Date"** shall mean the date on which the Court enters an Order confirming this Plan.

15.     **"Court"** shall mean the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, presiding over these Chapter 11 reorganization cases, or any successor court of competent jurisdiction.

16.     **"Creditor"** shall mean any person having a Claim against Debtor.

17.     **"Debt"** shall mean any obligation of Debtor, alone, and any obligation of Debtor and any other Person, to any Entity.

18.     **"Debtor"** or **"Debtors"** shall mean Revolution Monitoring, LLC, Revolution Monitoring Management, LLC and Revolution Neuromonitoring, LLC ,  the Debtors in the above-styled and numbered case.

19.     **"Disbursing Agent"** shall mean the Liquidating Trustee.

20.     **"Effective Date"** shall mean the Final Confirmation Date , or as soon thereafter as reasonably practical, but in no event later than 30 days after the Final Confirmation Date.

21. **"Entity"** shall include Person, estate trust, governmental unit and the United States Trustee.

22. **"Equity Interest Holders"** shall mean holders of the equity interests in the Debtors.

23. **"Final Confirmation"** shall mean that date which is eleven (11) days following the entry of the Order Confirming Plan, during which period of time no Notice of Appeal is filed, or if a Notice of Appeal is filed, during which period of time no Motion for Stay Pending Appeal is granted or supersedeas bond is approved and filed.

24. **"Litigation Fee Schedule"** means that schedule adopted by the Liquidating Trustee for the payment of litigation fees and costs.

25. **"Liquidating Trust"** shall mean that certain trust created pursuant to Article 6 hereof.

26. **"Liquidating Trust Agreement"** shall mean that certain trust agreement, the form and substance of which shall be acceptable to the Debtors, Xynergy and MedARC, to be filed as part of the Plan Supplement, which, among other things: (a) establishes and governs the Liquidating Trust; (b) describes the powers, duties and responsibilities of the Liquidating Trustee; and (c) provides for the liquidation and distribution of proceeds of the Liquidating Trust Assets.

27. **"Liquidating Trust Assets"** means all assets held from time to time by the Liquidating Trust, the proceeds of which shall be collected and distributed pursuant to the terms of the Plan and Liquidating Trust Agreement.

28. **"Liquidating Trust Beneficiaries"** means the Holders of Allowed Claims, and professionals employed by the Liquidating Trustee, pursuant to the terms of this Plan and the Liquidating Trust Agreement.

29. **"Liquidating Trust Books and Records"** means any of the Debtors' books and records (or copies thereof), including all information and data on computers owned or leased by the Debtors or otherwise on premises occupied by the Debtors, and all rights of access to such data of the Debtors, whether by subscription or otherwise and wherever such data is located.

30. **"Liquidating Trustee"** shall mean Jeffrey H. Mims, or such other independent trustee appointed to administer the Liquidating Trust.

31. **"Liquidating Trust Waterfall"** means the priority of payments and distributions to be made by the Liquidating Trust as set forth in Article 6 hereof.

32. **"MedARC"** or **"Collection Agent"** means MedARC LLC, as a representative of the Liquidating Trust and the Liquidating Trustee for the purpose of liquidating all Accounts Receivable.

33.     "**Net Proceeds for Allocation**" shall mean all funds remaining within the Liquidating Trust Waterfall after payment of all "B" payments within a Billing Cycle.

34.     "**Net Proceeds Collected**" means funds remaining within the Liquidating Trust Waterfall after payment of all "A" Payments within a Billing Cycle.

35.     "**Order Confirming Plan**" shall mean the Order of the Court determining that this Plan meets the requirements of Chapter 11 of the Code and is entitled to confirmation or filed for relief under Chapter 11 of the Code.

36.     "**Petition Date**" shall mean the date on which the Debtors filed these proceeding, for Revolution Monitoring, LLC, September 27, 2018 and for Revolution Monitoring Management, LLC and Revolution Neuromonitoring, LLC October 5, 2018.

37.     "**Plan**" shall mean this Joint Plan of Reorganization in its present form or as it may be amended, modified or supplemented.

38.     "**Plan Supplement**" means a compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed on notice to parties-in-interest, and additional documents filed as supplements or amendments to the Plan Supplement,  including the following: (a) the Liquidating Trust Agreement, (b) the identity of the Liquidating Trustee, if the Liquidating Trustee has not been appointed by the deadline to file the Plan Supplement, (c) and the Retained Causes of Action.  The Debtors or the proposed Liquidating Trustee shall file the Plan Supplement by the later of the deadline established by this Court or twenty (20) days following entry of an order confirming this Plan.

39.     "**Priority Claim**" shall mean any Claim entitled to priority pursuant to Section 507(a) of the Code except for Tax Claims and Claims incurred by the Debtor post-petition in the ordinary course of business.

40.     "**Rejection Claim**" shall mean any Claim arising out of the rejection of a lease or executory contract pursuant to Section 365 of the Code, which Claim shall be treated as an Unsecured Claim.

41.     "**Reorganized Debtor**" shall mean the Liquidating Trustee, or if a Liquidating Trustee is not appointed, the entity which shall assume title to and control of the Debtors' assets and liabilities upon confirmation as provided herein.

42.     "**Retained Causes of Action**" means, collectively, all Claims and Causes of Action which may be asserted by or on behalf of the Debtors, a non-exclusive list of which is set forth in the Plan Supplement, against any third-parties, investors, individuals, or insiders that the Debtors own or have an interest in or can assert in any fashion, whether pre-petition or post-petition, including, without limitation, litigation claims, whether such causes of action arise from contract, tort theories of liability, insurance claims (including Accounts Receivable and related Causes of Action), statutory claims, equitable claims or other claims, objections to Claims,

adversary proceedings, and Avoidance Actions against any Person or Entity identified on the Statement of Financial Affairs of any Debtor as a recipient of a payment made, services provided, obligation incurred or property transferred by or on behalf of such Debtor prior to the Petition Date, in each case, that have not been released, exculpated, waived, settled or barred that are not otherwise settled or released on or prior to the Effective Date that will be transferred to the Liquidating Trust on the Effective Date. For the avoidance of doubt, Retained Causes of Action shall include all Accounts Receivable.[1] For the further avoidance of doubt, Retained Causes of Action shall include the Liquidating Trustee's right to rely upon the tolling provisions of 11 U.S.C. § 108.

43. **"Secured Claim"** shall mean an Allowed Claim secured by a lien, security interest, or other encumbrance on the properties owned by the Debtor, which lien, security interest, or other encumbrance has been properly perfected as required by law, to the extent of the value of the property encumbered thereby. That portion of such Claim exceeding the value of the security held therefor shall be an Unsecured Claim, as defined below and determined pursuant to 11 U.S.C. §506(a).

44. **"Tax Claims"** shall mean any Claim entitled to priority under Section 507(a)(8) of the Code and shall include the claims of taxing authorities for taxes owed on the property retained by the Debtor under this Plan.

45. **"Unsecured Claim"** shall mean any Allowed Claim, whether or not liquidated or contingent other than a Priority Claim, a Tax Claim, or a Secured Claim.

## ARTICLE 2
## CERTAIN GENERAL TERMS AND CONDITIONS

The following general terms and conditions apply to this Plan:

2.1 Claims and Debts: Various types of Claims and Debts are defined in this Plan. This Plan is intended to deal with all Claims and Debts against the Debtor of whatever character whether or not contingent or liquidated and whether or not allowed by the Court pursuant to Section 502(a) of the Code and all Claims and Debts will receive the treatment afforded in Articles 4, 5 and 6 of this Plan. Claims and Debts incurred by the Debtor post-petition in the ordinary course of business will be paid by the Debtor according to their terms as they come due.

2.2 **Securities Laws**: The issuance of any security in satisfaction of indebtedness under this Plan may be exempt from registration under certain State and Federal securities laws by virtue of Section 1145 of the Code and the exemption therein contained.

2.3 **Time for Filing Claims**: With respect to those Claims that have been identified in the Schedules filed pursuant to Section 521(1) of the Code and which have been scheduled as "disputed," "contingent," or "unliquidated," said Claimants <u>must</u> file a proof of claim bearing the

---

[1] Definition 17 and 27 are modification of existing definitions within the Amended Plan, as modified. Definitions 32-46 are new definitions for inclusion in the Amended Plan.

case number of the above-styled and referenced proceeding with the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, on or before the Bar Date to participate under this Plan. Claims scheduled as disputed, contingent, or unliquidated filed after the Bar Date shall not be allowed, and shall not participate in the distributions contemplated by this Plan. Claims arising from rejection of a lease or executory contract shall be made prior to the time for objecting to confirmation of Debtor's Plan. Administrative claims shall be filed with the Court within thirty (30) days following approval of the Debtor's Plan.

2.4 **Modifications to Plan**: In accordance with Bankruptcy Rule 3019, to the extent applicable, this Plan may be modified upon application of Debtor or corrected prior to Confirmation without notice and hearing and without additional disclosure pursuant to Section 1125 of the Code provided that, after hearing on and notice to the creditors, the Court finds that such modification does not materially or adversely affect any Creditor or Class of Creditor.

## ARTICLE 3
## TREATMENT OF UNCLASSIFIED CLAIMS
## (CERTAIN ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS)

3.1 All trade and service debts and obligations incurred in the normal course of business by the Debtor on or after the Petition Date will be paid when due in the ordinary course of the Debtor's business unless a different time for payment is specified in this Plan.

3.2 All post-petition and post confirmation taxes, including 2019 and beyond ad valorem taxes, sales and use taxes, and franchise taxes, incurred in the normal course of business by the Debtor or Reorganized Debtor on or after the Petition Date will be paid pursuant to their respective statutory due date. Such tax creditors shall not be required to file an administrative claim for such taxes as a requirement to being paid.

## ARTICLE 4
## DIVISION OF CREDITORS INTO CLASSES

4.1 Classification of Claims: This Classification of Claims is made for purposes of voting on this Plan, making distributions thereunder, and for ease of administration thereof. Unless specifically provided otherwise herein, on the Confirmation Date this Plan discharges and extinguishes all Claims and Debts against the Debtor of whatever character, whether allowed by the Court or otherwise.

4.2 Class 1: Consists of Allowed Administrative Claims. (Not Impaired)
Class 2: Consists of Allowed IRS Tax Creditor Claims. (Impaired)
Class 3: Consists of Allowed Comptroller Claims. (Impaired)
Class 4: Consists of Allowed Secured Claims of John McHalffey. (Impaired)
Class 5: Consists of Allowed Secured Claim of Xynergy Heathcare Capital II, LLC. (Impaired)
Class 6: Consists of the Allowed Secured Claim of World Global Funding. (Impaired)

Class 7:  Consists of Allowed General Unsecured Claims.(Impaired)
Class 8:  Consists of Allowed Equity Interest Holder Claims. (Not Impaired)

# ARTICLE 5
# TREATMENT OF CLASSES

5.1 <u>Satisfaction of Claims and Debts</u>: The treatment of and consideration to be received by holders of Allowed Claims or interests pursuant to this Article 5 of this Plan shall be in full settlement, release and discharge of their respective Claims, Debts, or interests as against the Debtor subject to the provisions herein.  On the Confirmation Date, the Liquidating Trustee shall assume all duties, responsibilities and obligations for the implementation of this Plan.  Any class of Claimants failing to vote on this Plan shall be deemed to have accepted this Plan in its present form or as modified or amended as permitted herein.

5.2 **Class 1 Claimants (Allowed Administrative Claims of Professionals and US Trustee)** are unimpaired and will be paid in cash and in full on the Effective Date of this Plan. Professional fees are subject to approval by the Court as reasonable. Debtors' attorney's fees approved by the Court will be paid following the later of Confirmation or approval by the Court out of the available cash. The Class 1 Claimants with Allowed Claims may agree to a different treatment. Class 1 Creditor Allowed Claims are estimated as of the date of the filing of this Plan to not exceed the amount of $50,000 including Section 1930 fees.  Section 1930 fees shall be paid in full prior to the Effective Date.  The Debtor is required to continue to make quarterly payments to the U.S. Trustee and may be required to file post-confirmation operating reports until this case is closed.  The Class 1 Claimants are not impaired under this Plan.

5.3 **Class 2 Claimants (Allowed IRS Priority Tax Creditor Claims)** are impaired and shall be satisfied as follows:  The Allowed Amount of all Priority Tax Creditor Claims of the Internal Revenue Service ("IRS") shall be paid out of the revenue from the collection of the Medical Receivables. The Secured and Priority Tax Creditor Claims are alleged to be in approximate amount of $789.31. The IRS unsecured claim shall be treated under Class 6. To the extent that the IRS has a lien claim it shall retain its liens against the property of the Debtor, but shall release its liens, if any, when paid in full as called for by this Plan.

The Class 2 Claimants are impaired under this Plan.

5.4 **Class 3 Claimants (Allowed Claims of the Comptroller)** are impaired and shall be satisfied as follows:  The Allowed amount of Tax Claims of the Comptroller for Franchise Tax is asserted to be $36,050. To the extent that this claim has not already been paid it shall be paid out of the collections of the Medical Receivables of the Debtors. The claims of the Comptroller will accrue interest at the rate of 6.5% per annum until paid. The payments shall be due monthly on the 15th day of the month commencing 60 days following the Effective Date of the Plan and paid in full within five years of the Petition Date.

A failure by the Reorganized Debtor to make a payment to the Comptroller pursuant to the terms of the Plan shall be an Event of Default.  If the Reorganized Debtor fails to cure an Event of Default as to tax payments within ten (10) days after service of written notice of default

from the Comptroller, the Comptroller may (a) enforce the entire amount of its claim, (b) exercise all rights and remedies under applicable non-bankruptcy law and (c) seek such relief as may be appropriate in this court. Notice of the default shall be served by first class mail upon the reorganized Debtor at: 6437 Southport, Dallas, Texas 75248, Attn: Chief Executive Officer, and upon Debtor's attorney at: Joyce W. Lindauer Attorney, PLLC, 12720 Hillcrest Road, Suite 625, Dallas, Texas 75230, Attn: Joyce Lindauer, Esq.

The Debtor shall be allowed to cure up to two (2) defaults. Upon a third default, the Comptroller, at its option, may declare the default non-cureable and proceed to collect the remainder of the debt.

The Class 3 Claimant is impaired under this Plan.

5.5 **Class 4 Claimant (Allowed Secured Claim of John McHalffey)** is impaired and shall be satisfied as follows: John McHalffey ("McHalffey") has filed a Proof of Claim asserting a secured claim against Debtor Revolution Neuromonitoring, LLC. McHalffey asserts a Cash Loan Security Agreement dated August 12,2016 in the original amount of $200,000. McHalffey filed a UCC-1 Financing Statement number 17-0024480935 on July 18, 2017 asserting a lien on "Certain Accounts Receivable for Invoices Issued in 20915 and 2016". Debtor is unable to determine at this time the validity and priority of the McHalffey claim. To the extent, McHalffey has an identifiable claim to particular invoices of Revolution Neuromonitoring, LLC which are collected as part of this Plan, McHalffey shall be paid the amount of his allowed secured claim from the collection of his secured invoices in the order of priority of his security interest. In the event, McHalffey does not have a properly perfected security interest he shall have a Class 7 claim.

The Class 4 is impaired under this Plan.

5.6 **Class 5 Claimant (Xynergy Healthcare Capital II, LLC)** is impaired and shall be satisfied as follows: Debtors Revolution Monitoring Management, LLC and Revolution Neuromonitoring, LLC entered into that certain Healthcare Receivables Master Purchase and Sale Agreement ("Agreement") with Xynergy on or about November 22, 2016. On or about November 22, 2016 Debtor Revolution Monitoring, LLC executed that certain Guaranty and Security Agreement by Corporation ("Guaranty") guarantying the obligations of Revolution Monitoring Management, LLC and Revolution Neuromonitoring, LLC. Xynergy perfected its interests in the Medical Receivables through the filing of UCC-1 Financing Statements. On or about May 18, 2018, the United States District Court for the Southern District of Florida entered that certain Consent Final Judgment in favor of Xynergy and against the Debtors in the amount of $1,681,767.57 ("Xynergy Claim").The Xynergy Claim shall be paid in accordance with the terms of the collection agreement it has executed with MedArc described herein.

The Class 5 Claim is impaired under this Plan.

5.7 **Class 6 Claimant (World Global Capital, LLC)** is impaired and shall be satisfied as follows: On or about September 25, 2017, Debtors entered into that certain Secured Merchant Agreement ("Agreement") with World Global Capital, LLC dba Cardinal Funding

("World") for the sale and purchase of certain future accounts receivable in the original amount of $224,850. World allegedly perfected its interest in the accounts receivable through a UCC-1 Financing Statement number 17-0037668846 filed November 7, 2017. On or about November 7, 2017, World obtained a Judgment against the Debtors in the amount of $202,705.66. The Debtors dispute the validity of the lien of World in that no future receivables were produced after September 25, 2017 for World's lien to attach. To the extent, World has a valid lien and an Allowed Claim, World will be paid the amount of its Allowed Secured Claim from the proceeds of the collections after payment in full to the Allowed Claims in Classes 1 through 5 above. To the extent it is an unsecured creditor it shall be treated in Class 7 herein.

The Class 6 Claimant is impaired under this Plan.

5.8 **Class 7 Claimants (Allowed Unsecured Creditors)** are impaired and shall be paid their pro rata share of a Class 7 Unsecured Creditors Pool. The Class 7 Claimants shall specifically include the claims if any of Texas Legal Escrow, LLC ("Texas Legal"). Texas Legal has not filed a Proof of Claim in the estates of any of the Debtors. The Claims of Texas Legal were listed as disputed, unliquidated and contingent by the Debtors. Texas Legal filed a UCC-1 file number 17-0002682531 asserting a security interest in the Medical Receivables. Confirmation of this Plan shall allow the Debtors to file a UCC-3 Termination of the alleged security interest of Texas Legal. The Class 7 Creditors shall share pro rata in all funds recovered pursuant to the collection agreement set forth below after payments of creditors in Classes 1 thorough 6 above.

The Liquidating Trustee shall also pursue any and all Avoidance Actions, claims, causes of action or enforceable rights of the Debtors against third parties, or assertable by the Debtors on behalf of Creditors, its Estate, or itself for recovery, turnover or avoidance of obligations, or preferential or fraudulent transfers of property or interests in property and other types or kinds of property or interests in property recoverable or avoidable pursuant to Chapter 5 or other sections of the Bankruptcy Code or any applicable law including, without limitation, 11 U.S.C. §§ 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553. Any and all claims or causes of action of the Debtors or its Estate relating to any pre- or post-petition activities against any one or more of any entity or person related to, owned by or affiliated with any current or former professionals of the Debtors (including, without limitation, legal, accounting, tax advisors or consultants) including, without limitation, claims or causes of action for: (i) breaches of fiduciary duty; (ii) fraud or fraudulent inducement; (iii) negligence; (iv) fraudulent or negligent misrepresentations; (v) legal, accounting or other professional negligence or malpractice; (vi) illegal dividends or payments received; (vii) civil conspiracy; (viii) fraudulent insurance acts; (ix) violations of any consumer protection act or deceptive trade practice act; (x) unjust enrichment; (xi) breach of contract; (xii) tortious interference with contracts or prospective relations; (xiii) deceit by misrepresentation or concealment; (xiii) common law fraud; (xiv) corporate waste; (xv) deepening insolvency; (xvi) alter ego; and (xvii) embezzlement. Any and all claims or causes of action of the Debtors or its Estate relating to any pre- or post-petition activities against the Debtors' former officers, directors, principals or advisors; and any current or former professionals of the Debtors (including, without limitation, legal, accounting, tax advisors or consultants) including, without limitation, claims or causes of action for: (i) breaches of fiduciary duty; (ii) fraud or fraudulent inducement; (iii) negligence; (iv) fraudulent or

negligent misrepresentations; (v) legal, accounting or other professional negligence or malpractice; (vi) illegal dividends or payments received; (vii) civil conspiracy; (viii) fraudulent insurance acts; (ix) violations of any consumer protection act or deceptive trade practice act; (x) unjust enrichment; (xi) breach of contract; (xii) tortious interference with contracts or prospective relations; (xiii) deceit by misrepresentation or concealment; (xiii) common law fraud; (xiv) corporate waste; (xv) deepening insolvency; or (xvi) alter ego; and nothing shall estop the Debtors or Reorganized Debtors from asserting claims or causes of action just because they were not scheduled or described in detail in the Debtors' Schedules or Disclosure Statement. To the extent that such Claims are not the collateral of Xynergy such Claims shall be collected for the benefit of the Allowed Priority Claims and the Allowed Unsecured Claims in these cases. The value of such Claims or their monetization has not been determined.

Allowed Unsecured Claims shall receive payments under the Plan as soon as possible after payments of senior creditor Classes. The Plan projects to pay such claims in full.

The Court shall retain jurisdiction to hear and decide any collection matters and matters involving claims and causes of action of the estate that affect property of the estate following Confirmation.

The Class 7 Claimants are impaired under this Plan.

5.9     **Class 8 Claimant** (Equity Holders) are not impaired. The members of the Debtors shall retain their membership interest in the Debtors post confirmation.

Class 8 interest holders are not impaired under this Plan.

## ARTICLE 6
## MEANS FOR EXECUTION OF THE PLAN

6.1     Any actions required to be taken by the Debtor on the Effective Date may be taken by the Debtor before the Effective Date or immediately following the date of Final Confirmation.

6.2     The powers, authority, responsibilities, and duties of the Liquidating Trustee shall be set forth in and will be governed by the Liquidating Trust Agreement. The Liquidating Trustee shall be a representative of the estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

6.3     The Liquidating Trust shall be established for the purpose of liquidating and distributing the Liquidating Trust Assets, for the benefit of the Beneficiaries, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose described in the Plan and set forth in the Liquidating Trust Agreement. Allowed Claims shall be paid primarily out of the net revenue from collection of the Accounts Receivable, together with any additional cash held or collected from the Retained Causes of Action and any remaining Liquidation Trust Assets.

6.4     On the Effective Date, the Liquidating Trustee shall sign the Liquidating Trust Agreement and all assets of the Debtors, including all cash, accounts receivable, patient medical records, billing records, banking records, billing ID's, billing numbers, medicare ID's, software licenses, passwords, and any other documents, licensure, or information that Debtors have previously used and relied upon, or that is necessary to effect the billing and collection of the Accounts Receivable, shall be transferred, granted, assigned, conveyed, set over, and delivered to the Liquidating Trust, for the benefit of the Liquidating Trust Beneficiaries, in the form thereof existing on such date.  All of the Debtors' right, title and interest in and to all of the Debtors' assets, shall be free and clear of any and all liens, Claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons and Entities, other than (i) the liens securing the Xynergy Claim; and (ii) any defenses and other rights of potential defendants (including any rights to set off) with respect to Causes of Action, including without limitation, any Accounts Receivable transferred to the Liquidating Trust. The Debtors and the Liquidating Trustee may (a) execute and deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), and (b) take, or cause to be taken, all such further action in order to evidence, vest, perfect or effectuate the transfer of the Liquidating Trust Assets to the Liquidating Trust and consummate transactions contemplated by and to otherwise carry out the intent of the Plan. Upon the transfer of the Liquidating Trust Assets, the Liquidating Trustee shall succeed to all of the Debtors' right, title and interest in the Liquidating Trust Assets, and the Debtors will have no further rights or interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust, other than as expressly provided herein, in the Plan and the Order of Confirmation.  In connection with the Liquidating Trust Assets, any attorney-client privilege, work product privilege, joint interest privilege or other privilege or immunity attaching to any documents or communications (in any form, including, without limitation, written, electronic or oral) shall be transferred to and shall vest in the Liquidating Trust. The Liquidating Trustee's receipt of such privileges associated with the Liquidating Trust Assets shall not operate as a waiver of those privileges possessed or retained by the Debtors, nor shall it operate to eliminate the rights of any co-defendant to any applicable joint privilege.

6.5     The Liquidating Trust is to be managed by the Liquidating Trustee. As a representative of the Liquidating Trustee, the Collection Agent will be responsible for taking the necessary and appropriate actions to liquidate and collect the Accounts Receivable, including but not limited to taking all actions necessary to bill, rebill, collect, settle, bring lawsuits, settle lawsuits, bring claims, enforce claims, manage litigation, enter into collection agreements with third party collection agencies, enter into engagement agreements with law firms to commence legal adjudication of collections, and to proceed with orderly, expeditious, and efficient collection processes, including filing lawsuits in the name of the Liquidating Trustee, as necessary, in order to collect the Accounts Receivable in accordance with the terms of the Plan. Any actions required to be taken by any Debtor regarding the Accounts Receivable on the Effective Date may be taken by either the Liquidating Trustee or the Collection Agent immediately upon appointment or immediately following the date of Final Confirmation.  The Collection Agent shall have discretion, to sue or not sue on any Account Receivable and to waive, release or settle, subject to the limitation set forth herein and below, particular patient claims, based upon its commercially and legally reasonable assessment of the likelihood of collection.  The Collection Agent shall have authority, in its sole discretion to settle or prosecute any Account Receivable or group of Accounts Receivable with a proposed settlement amount

equal to or less than $250,000.00, without seeking approval of the Bankruptcy Court or separate written approval from the Liquidating Trustee for any particular settlement. For any Account Receivable with a proposed settlement amount value over $250,000.00 in the aggregate, the Collection Agent shall obtain the Liquidating Trustee's written consent, and may, but is not required to, seek Bankruptcy Court approval pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. The Collection Agent shall not be retained for any purpose(s) other than liquidation of the Accounts Receivable.

6.6     The Liquidating Trustee will administer all assets of the Debtors' estates; investigate and liquidate any Retained Causes of Action that are not Accounts Receivable; and take all actions necessary to proceed with an orderly, expeditious, and efficient wind-down and distribution of the remaining assets of the Debtors in accordance with the terms of the Plan. The Liquidating Trustee shall have full authority to act in the stead of the Debtors in implementation of the Plan, satisfying Bankruptcy Court requirements, appearing in court, hiring and firing professionals and otherwise managing the affairs of the Debtors. The Liquidating Trustee may seek information and advice from the prior officers, directors and owners of the Debtors but shall have no obligation to follow such advice or act upon such information. The Liquidating Trustee shall be an independent third party responsible to the Court and the creditors of these estates.

6.7     The Liquidating Trustee shall also be vested with the Debtors' rights, as such rights existed prior to the Effective Date, to conduct discovery and oral examinations of any party under Bankruptcy Rule 2004. The Liquidating Trustee, however, shall not be considered a successor of any Debtor and shall not assume any obligations of the Debtors other than expressly provided for herein or in the Liquidating Trust Agreement.

6.8     The Liquidating Trustee shall be Jeffrey H. Mims ("Mr. Mims"). Mr. Mims shall receive monthly compensation from available funds in the Liquidating Trust, as a flat fee in the amount of $3,500.00 per month, plus reimbursement of actual, necessary expenses, to be paid monthly at the end of each month following the Effective Date, for a period of nine months absent further intervening orders of the Bankruptcy Court that change this compensation arrangement. If, during any month after his appointment as Liquidating Trustee, Mr. Mims expends more than ten (10) hours in the performance of his duties as Liquidating Trustee, Mr. Mims shall be compensated at a rate of $350.00 per hour from available funds in the Liquidating Trust for each additional hour of services. In the absence of other intervening orders, the Liquidating Trustee reserves the option to apply for a further extension or modification of the monthly compensation paid to Mr. Mims.

6.9     Under the terms of this Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall employ MedARC LLC ("MedARC") to serve as Collection Agent and to collect the Medical Receivables for the benefit of the Liquidating Trust Beneficiaries. On the Effective Date, MedARC and the Liquidating Trustee shall sign the Liquidating Trust Agreement, which shall set forth the terms of MedARC's rights and responsibilities as Collection Agent. Subject to the Liquidating Trustee's control and discretion, MedARC shall, upon the Effective Date, have full authority regarding the Accounts Receivable to: (i) bill, rebill, and collect the Medical Receivables; (ii) bring lawsuits and settle lawsuits; (iii) negotiate, bring, enforce and settle claims, together with all lawful actions necessary for collection thereof; (iv)

enter into collection agreements with third-party collection agencies; (v) enter into engagement agreements with law firms to commence legal adjudication of collections, on behalf of the Debtors and the Liquidating Trustee.

6.10 After payment of expenses, the Net Proceeds Collected by MedARC shall be used to pay the creditors in the order of priority set forth herein. The Liquidating Trustee, acting independently, or through MedARC, may hire one or more law firms as Collection Attorneys to pursue litigation on collections and each retained law firm shall be paid a contingent fee of funds actually recovered in accordance with the uniform sliding fee scale set forth in the Litigation Fee Schedule, which will be filed with the Plan Supplement. The Liquidating Trustee shall have authority to employ alternative or additional Collection Attorneys and professionals.

6.11 The Liquidating Trustee intends to utilize the Collection Agent to create and propose an expedited mediation schedule, an expedited discovery rules and timeframes for the purpose of expeditiously and economically recovering funds owed to the estates for accounts receivables and medical receivables.

6.12 The cash proceeds of the Liquidating Trust shall be distributed from available funds in accordance with the following priority of payments (the "Liquidating Trust Waterfall"):

    A.    Professional expenses, including cost of collections & legal costs ("A" Payments).

    1)    From the gross amount of any singular or group of Accounts Receivable, the first "A" Payment from proceeds shall be to pay (a) the Liquidating Trustee monthly compensation as set forth in the Liquidating Trust Agreement and Section 6.7 herein, or as modified by further order of the Bankruptcy Court; and (b) third-party collection agencies or attorneys employed by the Liquidation Trustee in either in accordance with the terms of the Liquidating Plan and the Litigation Fee Schedule, or at commercially reasonable rates for the type and condition of the Accounts Receivable that is the subject of their collection (aged, rebilled, etc.), with the amount and method of such professional fees to be disclosed in the Liquidating Trust Agreement and Plan Supplement.

    2)    The second "A" Payments shall be for: (a) the expense of maintaining Debtors' EMR account (USMON) not to exceed $60,000 annually; (b) payment for any hourly fees billed by the Liquidating Trustee in excess of $3,500 within a Billing Cycle; and (c) then for Debtors' bankruptcy counsel not to exceed $100,000 in the aggregate. All professional fees and expenses payable to Debtors' bankruptcy counsel shall be subject to application and approval by the Bankruptcy Court. All professional fees and expenses payable to the Liquidating Trustee in excess of $3,500 within a Billing Cycle, shall be subject to deemed approval and payment following a seven (7) day period of notice and opportunity to object, as prescribed by the Liquidation Trust Agreement.

B.    Net Proceeds Collected ("B" Payments).

1)    After all outstanding "A" Payments have been made during a Billing Cycle, the first "B" Payments shall be allocated between MedARC and Xynergy in accordance with the allocation formula set forth in that certain Assignment & Payout Agreement ["Assignment"] which was executed June 14, 2019, by and between MedARC and Xynergy, which Assignment is attached hereto as Exhibit "A" and is incorporated herein by reference for all purposes as if set forth herein verbatim.[2]  As set forth more fully in the Assignment attached hereto as Exhibit "A," MedARC agrees that, if the Xynergy claim is not paid in full by the two-year anniversary of the Effective Date, Xynergy shall be entitled to receive 100% of the Net Proceeds Collected until its claim has been paid in full.

2)    The second "B" Payments shall be to MedARC in a contingent percentage which varies between 30% and 50% of the Net Proceeds Collected (see Assignment attached hereto as Exhibit "A") - not to exceed an amount of $500,000, representing a portion of its costs of managing and overseeing the collection of Accounts Receivable on behalf of the Debtors, all creditors, and the Liquidating Trustee.

3)    The third "B" Payments shall be to any other secured creditor that is the Holder of an Allowed Secured Claim in an amount not to exceed $100,000. Any claim exceeding $100,000 will be treated as an Allowed Unsecured Claim. Any other claims of the Debtors' creditors shall be treated as "C" payments taken from the Debtors 40% share of Net Proceeds for Allocation.

4)    The fourth "B" Payments shall be to Debtors' representative for assistance in the collection of Accounts Receivable not to exceed $35,000.00 in any 12- month period, but continuing each year until the  Liquidating Trust is dissolved, this Bankruptcy Case is closed, or collection operations have substantially ceased, and subject to the receipt of proceeds.

C.    Net Proceeds for Allocation ("C" Payments).

1)    40% of the Net Proceeds for Allocation during a Billing Cycle shall be remitted by MedARC to the Liquidating Trustee for distribution to holders of all other Allowed Claims.

---

[2] Pursuant to the Assignment & Payout Agreement ["Assignment"] attached hereto as Exhibit "A," Xynergy has agreed to transfer and assign its Allowed Secured Claim to MedARC, subject to the Bankruptcy Court's approval and entry of an Order of Confirmation.  To the extent of any conflict between the Assignment and the Liquidating Trust Agreement, the Assignment controls.

2) 60% of the remaining Net Proceeds for Allocation during a Billing Cycle shall be payable to (retained by) MedARC as compensation for effecting the collection of the Accounts Receivable.

6.13     Beginning no later than ninety (90) days after the Effective Date, and continuing each month thereafter, the Collections Agent shall provide the Liquidating Trustee with written reports of Accounts Receivable activity and collections. Such reports shall specify all fees, expenses and costs incurred by the Collection Agent in the performance of its duties, as well as all funds recovered from such activities during the relevant reporting period.     Any     fees, costs or expenses incurred by the Collection Agent are subject to its Claim for setoff and reimbursement in accordance with the provisions of the Liquidating Trust Waterfall and the Liquidating Trust Agreement.

6.14     All actions taken, and determinations made by, or on behalf of, the Liquidating Trustee hereunder in accordance with the provisions of the Plan shall be final and binding upon any and all persons. The Liquidating Trustee shall serve until the terms of the Plan are fulfilled. The Liquidating Trustee may resign by an instrument in writing filed with the Bankruptcy Court at least thirty (30) days before the proposed effective date of the resignation. The Liquidating Trustee shall continue to serve as Liquidating Trustee after the delivery of the resignation until the proposed Effective Date, unless the Liquidating Trustee consents to an earlier effective date, which shall be the date of appointment of a successor Liquidating Trustee.

6.15     The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the trust. The Liquidating Trustee will not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement. The Liquidating Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to 26 C.F.R. § 1.671-4(a) and in accordance with this section of the Plan. The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to each Holder in accordance with its relative beneficial interest in the Liquidating Trust. The Liquidating Trustee also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes. The Liquidating Trustee shall be responsible for filing all federal, state, local and non-U.S. tax returns for the Liquidating Trust. The Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local, or non-U.S. taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

6.16     The Liquidating Trust shall be dissolved as soon as practicable after the date that is the earlier to occur of: (a) the distribution of all Liquidating Trust Assets available for distribution pursuant to the Plan, or (b) a determination of the Liquidating Trustee that the administration of the Liquidating Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit; provided, however, that in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date, unless the Bankruptcy Court, upon motion within the six (6) months prior to the fifth (5th) anniversary of the Effective Date (or within six (6) months prior to the end of an extension period), determines that a fixed-period

extension is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

6.17    To the extent that the terms of the Plan with respect to the Liquidating Trust are inconsistent with the terms set forth in the Liquidating Trust Agreement, then the terms of the Liquidating Trust Agreement shall govern.    To the extent of any conflict between the Assignment (Exhibit "A") and the Liquidating Trust Agreement regarding the relationship, rights and obligations MedARC and Xynergy have to one another, the Assignment controls.

6.18    The Liquidating Trust Agreement shall provide for the following with respect to exculpation, indemnification, and insurance: (1) neither the Liquidating Trustee nor his advisors or professionals, shall be liable for any damages arising out of the creation, operation or termination of the Liquidating Trust, including actions taken or omitted in fulfillment of his or her duties with respect to the Liquidating Trust, except in the case of such party's gross negligence, bad faith or willful misconduct; provided, that in no event will any such party be liable for punitive, exemplary, consequential or special damages under any circumstances; and (2) neither the Liquidating Trustee nor his advisors or professionals shall be subject to any personal liability whatsoever, whether in tort, contract or otherwise, to any person in connection with the affairs of the Liquidating Trust and all persons claiming against the Liquidating Trustee, or otherwise asserting claims of any nature in connection with affairs of the Liquidating Trust, shall look solely to the Liquidating Trust Assets for satisfaction of any such claims.

6.19    The Liquidating Trustee may be removed from office upon application and order of the Bankruptcy Court or such other court of competent jurisdiction for (i) fraud or willful misconduct in connection with the affairs of the Plan, (ii) for such physical or mental disability as substantially prevents the Liquidating Trustee from performing the duties of Liquidating Trustee hereunder or (iii) for cause, which shall include a breach of fiduciary duty or an unresolved conflict of interest.

6.20    In the event Mr. Mims does not become Liquidating Trustee, or in the event of a vacancy by reason of the death or removal of the Liquidating Trustee or prospective vacancy by reason of resignation, a successor Liquidating Trustee shall be appointed by order of the Bankruptcy Court or such other court of competent jurisdiction.

6.21    Notwithstanding anything contained herein, the Liquidating Trustee shall have the right to request the Bankruptcy Court to enter an order disallowing any claim of any Entity or Person from which property is recoverable under Sections 542, 543, 550, and 553 of title 11, or that is a transferee of a transfer avoidable under Sections 544, 545, 548, or 549 of title 11 unless such Entity, Person or transferee has paid the amount, or turned over any such property, for which such Entity or transferee is liable.

## ARTICLE 7
## SECTION 1129(b)(2)

7.1     The Court may confirm this Plan even though less than all of the Classes of Claims and interests accept it.  The requirements for confirmation of a plan over the objection of one or more classes of claims or interests are set forth in Section 1129(b) of the Code. Accordingly, Debtor, as the plan proponent, requests the Court to determine that this Plan does not discriminate unfairly, and is fair and equitable with respect to the rejecting creditor.

## ARTICLE 8
## STATUS OF EXECUTORY CONTRACTS

8.1     Except as provided herein, all unexpired leases and executory contracts that have not been expressly assumed prior to the Effective Date shall be rejected on the Effective Date.

## ARTICLE 9
## EVENTS OF DEFAULT AND EFFECT THEREOF

9.1     No Claimant shall have the right to enforce any rights under this Plan until the Reorganized Debtor fails to cure any default hereunder within thirty (30) days of receipt of written notice of such default to Reorganized Debtor.

## ARTICLE 10
## DISCHARGE

10.1     Upon Confirmation, to the extent that a Claim or Debt has not been dealt with under this Plan, such Claim or Debt will be released.

10.2     The automatic stay imposed by Section 362 of the Code or any preliminary injunction granted by the Court to allow for Substantial Consummation of this Plan shall remain in effect until the Effective Date.

## ARTICLE 11
## AMENDMENTS TO THE PLAN

11.1     Debtor may modify this Plan following Confirmation and before Substantial Consummation to the extent consistent with the requirements of section 1122 and 1123 of Title 11.  The Plan as modified becomes the Plan if circumstances warrant modification and the Court approves of such modifications.

11.2     In the event of modification of this Plan pursuant to Section 11.1, any holder of a Claim or interest that has accepted or rejected this Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within ten (10) days of service of the Plan modifications upon such holder, such holder changes its previous acceptance or rejection.

## ARTICLE 12
## EFFECT OF CONFIRMATION

12.1    The provisions of this Plan bind Debtor, any Entity issuing securities under this Plan any Entity acquiring property under this Plan, and any Creditor or Equity Interest Holder, whether or not the Claim or interest of such Creditor or Equity Interest Holder is impaired under the Plan and whether or not such Creditor or Equity Interest Holder has accepted this Plan.

12.2    All property of the estate is vested in the Reorganized Debtor.

12.3    All property of the Reorganized Debtor is free and clear of all Claims and interests of Creditors and Equity Interest Holders, except as to claims, secured claims or secured debentures and interests specifically granted in this Plan.

12.4    All Debts that arose before the Confirmation Date and any Debt of a kind specified in Section 502(g), 502(h) or 502(i) of the Code, whether or not a proof of claim based on such Debt is filed or deemed filed under Section 501, whether or not such Claim is allowed under Section 502; and whether or not the holder of such Claim has accepted this Plan; are, fully and finally satisfied by this Plan.

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

13.1    The obligations under this Plan to any particular Claim are governed by the laws of the State constituting the situs of the Debt represented by that particular Claim described in this Plan.

13.2    Equity Interest Holders are relieved from all liability, obligation or duty to initiate or pursue any causes of action of Debtor against any Entity.

13.3    Any caption herein is for convenience only and does not affect the construction of the Plan.

13.4    Any distribution pursuant to this Plan which remains unclaimed for a period of six (6) months from the due date of such distribution is forfeited.

## ARTICLE 14
## RETENTION OF JURISDICTION

14.1    Notwithstanding entry of the Order of Confirmation and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain jurisdiction over the Chapter 11 Cases, the Debtors, the Liquidating Trust, and the Liquidating Trustee with respect to all matters related to the Chapter 11 Cases, the Debtors, the Liquidating Trust and this Plan to the fullest extent permitted by law, including, without limitation, jurisdiction:

14.2    To direct any necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by the Plan and to perform any other act, including the satisfaction of any Lien, that is necessary for the consummation of this Plan.

14.3    To allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

14.4    To adjudicate, decide or resolve any and all matters related to the Accounts Receivable, including any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Accounts Receivable.

14.5    To adjudicate, decide or resolve any matters related to: (a) rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom and (b) any dispute regarding whether a contract or lease is or was executory or expired in connection with Debtor's estate and/or implementation of the Plan.

14.6    To liquidate damages or estimate Claims in connection with any disputed, contingent or unliquidated Claims.

14.7    To adjudicate all Claims to an ownership interest in any property of Debtors' estates.

14.8    To recover all assets and properties, including by lawsuit, of Debtors' estates wherever located.

14.9    To hear and determine Claims concerning Federal, State and local taxes pursuant to Section 346, 505, 525 and 1146 of the Code.

14.10   To hear and determine any action or proceeding brought by the Liquidating Trustee under Section 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Code, whether such action or proceeding is brought before or after the Effective Date.

14.11   To hear and determine any core proceeding, whether such proceeding is brought before or after the Effective Date.

14.12   To ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

14.13   To determine the validity, extent and priority of all Liens and security interests against property of Debtors' estate.

14.14   To consider any modification of this Plan under Section 1127 of the Code.

14.15   To decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan.

14.16   To hear and determine the Liquidating Trustee's requests for orders as are consistent with this Plan as may be necessary or desirable to execute, implement or consummate the provisions thereof.

14.17   To issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan.

14.18   To consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order.

14.19     To enter an order for final decree or order closing this case.


Dated: July 11, 2019.

Submitted By:

_/s/ Joyce Lindauer_
Joyce W. Lindauer
State Bar No. 21555700
Jeffery M. Veteto
State Bar No. 24098548
Joyce W. Lindauer Attorney, PLLC
12720 Hillcrest Road, Suite 625
Dallas, Texas 75230
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
ATTORNEYS FOR DEBTORS

Revolution Monitoring, LLC

*/s/ Jeremiah Vance*
By: Jeremiah Vance
Its: Managing Member

Revolution Monitoring Management, LLC

*/s/ Jeremiah Vance*
By: Jeremiah Vance
Its: Managing Member

Revolution Neuromonitoring, LLC

*/s/ Jeremiah Vance*
By: Jeremiah Vance
Its: Managing Member

## ASSIGNMENT & PAYOUT AGREEMENT

THIS ASSIGNMENT AGREEMENT (the "Agreement"), is entered into on June 14th 2019, (the "Effective Date") by and between Xynergy Healthcare Capital II LLC ("Assignor"), and MedARC, LLC ("Assignee"). All parties to this Agreement may be hereinafter respectively referred to as "Party" or collectively as "Parties."

## RECITALS

WHEREAS, on or about November 22, 2016, Assignor entered into a Healthcare Receivables Master Purchase and Sale Agreement with Revolution Monitoring Management, LLC and Revolution Neuromonitoring, LLC, which Financing Agreement was guaranteed by Revolution Monitoring, LLC, (collectively "Financing Agreement")(all such Revolution entities collectively referred to as "Revolution" or "Debtor"); and

WHEREAS, Assignor perfected its lien in Revolution's accounts receivable (the "Accounts Receivable") by and through the Financing Agreement with Revolution by filing with the Delaware Secretary of State a UCC-1 Financing Statements on December 23, 2016, UCC Initial Filing No. 20167999244, Service Request No. 20167256847, and UCC Initial Filing No. 20167998170, Service Request No. 20167256233, and with the Texas Secretary of State on January 11, 2017 UCC Initial Filing No. 17-0001206299, Document No. 708414110001 (collectively, "UCC Liens"); and

WHEREAS, Assignor filed suit in the United States District Court, Southern District of Florida, for enforcement of the Financing Agreement in the case styled Xynergy Healthcare Capital II LLC v. Revolution Monitoring Management, LLC, Revolution Neuromonitoring, LLC, Revolution Monitoring, LLC, JT Vance CNIM Corp., and Jeremiah Vance; Cause No. 9:17-cv-81007-WPD, wherein judgment was rendered in Assignor's favor on May 18, 2018 (the "Florida Judgment"), which Judgment is in the principal amount of $1,681,767.57 plus interest as provided in such Judgment, and which judgment was domesticated in the 160th Judicial District Court of Dallas County, Texas, Cause No. DC-18-07773 (the "Texas Judgment")(together, the Florida Judgment and the Texas Judgment may sometimes be referred to collectively as the "Judgment" and the Florida lawsuit and the Texas lawsuit may sometimes be referred to collectively as the "Lawsuits"), and for which the 160th Judicial District Court ordered turnover of the secured assets on September 28, 2018; and

WHEREAS, Revolution filed for bankruptcy protection in the United States Bankruptcy Court, Northern District of Texas, Dallas Division, Case No. 18-33730, jointly administered, ("Bankruptcy"), whereupon Assignor filed for relief from the automatic bankruptcy stay, which motion for relief was granted on March 7, 2019; and

WHEREAS, on or about April 3, 2019, Assignor filed a secured Proof of Claim in each of the three bankruptcy cases, each such claim being in the amount of $1,703,309.23 (collectively, these Proofs of Claim shall be referred to as the "Claims in Bankruptcy"); and

# EXHIBIT "A"

WHEREAS, Assignor desires to convey Assignor's interest in its rights, documents, claims, positions, security interests, Judgment, and assets described herein in return for Assignee's agreement to compensate the Assignor under the Payout Terms described herein, which will be incorporated into the Liquidation Trust Plan ("LTP") which Revolution (now the Debtor in Bankruptcy Court) will agree to abide by and file with the Court on or before June 19, 2019, with subsequent order coming on the earliest day judicially possible.

## TERMS

NOW, THEREFORE, in consideration of the premises as well as the Parties' respective promises, representations, covenants and warranties, the performance of each unto the other, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

For consideration of Ten and No/100 Dollars, the Payout Terms incorporated into this Agreement and the Assignee's promise to faithfully execute the terms of the LTP as agreed and submitted and approved by the Bankruptcy Court, and other good and valuable consideration ($10.00), the sufficiency of which is stipulated and in hand received, Assignor hereby grants to Assignee, all right, title, and interest to any and all: Financing Agreements, UCC Liens, Lawsuits, Judgment, and Claims in Bankruptcy, as well as any and all documents, claims, causes of action whether or not filed, pending or resolved, judgments, orders, contracts, contract interests, contract positions, security agreements, security interests, security positions, liens whether or not perfected, collateral, all legal and equitable rights or interests, debts, bills, receivables, proofs of claim, and any other rights or interests appurtenant thereto, arising out of or relating to Revolution (collectively, the "Assets"). Assignee does not accept nor does Assignor delegate to Assignee any debts, duties, liabilities, or obligations relating to the Assets.

## PAYOUT AGREEMENT

Assignee covenants to pay to Assignor, solely from the proceeds received from the collection of the Accounts Receivable, an amount up to and including the amount of the Judgment ($1,703,309.23 plus interest as provided in such Judgment from and after April 3, 2019). Payout of proceeds to the Assignor may be less than the Judgment should Net Cash Collected After Collection and Legal Fees ("Net Collections") be insufficient to cover both the amount of the Judgment and Assignee's agreed portion of Net Collections as described below. The term "Net Cash Collected After Collection and Legal Fees" means the gross amount of receivables collected by MedARC less [1] Third Party Cost of Collection (defined to include retention of collection agency, law firm, and licensure of USMON system only); and [2] Transaction Cost Reimbursement (defined to include Cavazos law firm only). Payment of the amounts as described below shall represent full and final payment of the Payout obligation under the terms of this Agreement, even if less than the amount of the Judgment, and subject only to the terms of the Liquidation Trust Plan as approved by the Bankruptcy Court, as follows.

Assignee will pay to Assignor the following from "Net Cash Collected After Collection and Legal Fees" with the Assignee participating in the priority payment by the Debtor and funds allocated as follows:

| Net Collections up to: | Assignor Receives | Assignee Receives |
|---|---|---|
| $1,364,000 | 50% | 50% |
| $2,114,000 | 60% | 40% |
| Over $2,114,000 | 70% | 30% |

For amounts over $3 million, Assignor shall continue receiving 70% of Net Collections until the amount of the Judgment ($1,703,309.23 plus interest from and after April 3, 2019) has been paid in full. Assignee will remit the Assignor's share of Net Collections within ten (10) days of receipt of funds (where funds are not subject to Trustee "holds" or other judicial controls).

Assignee agrees to provide weekly written reports to Assignor which set forth [1] the cumulative Gross Amount of Receivables collected by Assignee; [2] the cumulative Third Party Cost of Collection (itemized by Retention of Collection Agency, Law Firm, and Licensure for USMON System); [3] the cumulative Transaction Cost Reimbursement; and [4] the cumulative Net Cash Collected After Collection and Legal Fees.  Assignee agrees to discuss the reports with Assignor by phone.  In addition, Assignee agrees to meet with Assignor in person on a monthly basis at Assignee's office or such other location chosen by Assignee.

Notwithstanding anything herein to the contrary, if Assignee fails to pay Assignor the amount of the Judgment by the two-year anniversary of the Effective Date, then the allocation formula set forth above shall be modified to provide that, unless and until Assignee has paid Assignor the amount of the Judgment by such anniversary date, Assignor shall receive 100% of the Net Collections and Assignee shall receive 0% of the Net Collections, up to the amount of the Judgment ($1,703,309.23 plus interest from and after April 3, 2019).  The foregoing represents Assignor's sole recourse against Assignor based on Assignor's failure to receive Net Collections totaling the full amount of the Judgment (plus interest) by the aforementioned anniversary date; provided, however, that nothing herein shall be construed to limit Assignor's remedies against Assignee in the event of a breach of contract, defalcation, gross negligence, or fraud.

## REPRESENTATIONS AND WARRANTIES
## & OTHER TERMS

     Assignor hereby represents and warrants such that Assignee may act in full reliance thereby and which representations and warranties are known and disclosed to induce Assignee into this Agreement, the following:

1. Assignor hereby represents that neither it nor any person or entity related to or affiliated with Assignor (Affiliate), have received any payments from any insurer, patient, or other obligor relating to any debt or obligation incurred for the benefit of Revolution, which payments have diminished any receivable or collateral relating to Assets, which payment(s) have not been specifically disclosed to Assignee in the attached **Exhibit 1**, reflecting the statement of accounts and collateral made substantial part the basis of this Agreement.  As such, Assignor hereby assigns and conveys to Assignee any and all such monies paid.

2. In the event that any payment has been received or is received by Assignor or any Affiliate thereof, Assignor shall immediately upon discovery or delivery of same, deliver to Assignee said funds with or without demand, presentment, or notice.

3. Assignor agrees to fully cooperate and participate when requested, with administration of the Assets for the benefit of Assignee in the event that any third party, insurer, patient, court, or court officer requires validation of this Agreement or assignment of the Assets.

4. Continuing cooperation: Each Party commits to timely cooperate with the other in any regard to the subject matter of this agreement and to further the purposes of this agreement.

5. Assignor makes no warranty or representation, implied or express, as to the collectability or monetary value of the Assets.

6. Assignee makes no warranty or representation, implied or express, as to the collectability or monetary value of the Assets, or that the Assets are sufficient to pay the Judgment.

7. Subject to the undertakings of this Agreement, which are not impaired or prejudiced, Assignor agrees to hold Assignee harmless for any and all actions taken in the course of effecting recovery of the Assets, with the exception of gross negligence or defalcation.

8. Effective Date: The effective date of this Agreement for purposes of agreement of the Parties, is when it is executed. The effective date of the Assignment of the Assets shall be immediately upon approval of the Court of the LTP, unless agreed to be earlier by the Parties.

9. Condition of Assignment: Assignor and Assignee require as a condition of assignment that Revolution execute an Agreement with the Assignor, and with Assignee, substantially in the form herein that, on confirmation by the Court of the LTP, Revolution, Jeremiah Vance, and JT Vance CNIM Corp. will immediately withdraw all pending motions against Xynergy including but not limited to the Rule 60 Motion in the Florida lawsuit, agrees not to file any further motions or actions arising out of, regarding, or related to the Assets or the same transactions or occurrences, and agrees not to object to or challenge the Claims in Bankruptcy. Debtor further agrees not to pursue any actions against Xynergy or MedARC related to the Assets (including but not limited to any causes of action under Chapter 5 of the Bankruptcy Code), and to cancel the hearing currently set for June 27, 2019 in the 160th Judicial District Court of Dallas County, Texas, in Cause No. DC-18-07773.

## NOTICE

Any notice sent pursuant to this Agreement shall be by fax with confirmation of transmission, email with confirmation of receipt, USPS certified mail with return receipt requested, or by common carrier with tracking number for verification of delivery, to the Parties as follows:

| FOR NOTICE TO ASSIGNOR | FOR NOTICE TO ASSIGNEE |
|---|---|
| Alejandro Nathan | Russ Lambert |
| Xynergy Healthcare Capital II LLC | MedARC, LLC |
| 2650 N. Military Trail, Suite 420 | 3400 Carlisle St, Ste. 500 |
| Boca Raton, Florida 33431 | Dallas, TX 75204 |
| Phone/Fax: (954) 519-2386 (954) 252-3861 | Phone/Fax: (214) 734-0426 |
| anathan@xynergycapital.com | Russ@LambertTxLaw.com |

With Copy To:

D. Brent Wells or James E. Cuellar
Wells & Cuellar, P.C.
440 Louisiana, Ste. 718
Houston, TX 77002
Phone/Fax: (713) 222-1281 (713) 237-0570
bwells@wellscuellar.com
jcuellar@wellscuellar.com

EXECUTED this 14th day of June, 2019.

**ASSIGNOR, Xynergy Healthcare Capital II LLC.**

By:_____
    (Print Name)

Its:____President_____
    (Capacity)

EXECUTED this 14th day of June, 2019.

**ASSIGNEE, MedARC, LLC.**

By:_____
    Russell Lambert

Its: Manager

## EXHIBIT 1

### Judgment credits*

1. **July 20, 2018**          **$1,109.28**
2. **August 20, 2018**         **$8,741.17**
3. **October 29, 2018**        **$3,332.93 (Chase garnishment proceeds)**


**\*NOTE: these Judgment credits were received after the Florida Judgment was rendered (May 18, 2018), and these Judgment credits are already reflected and taken into account in calculating the amount of the Judgment as of April 3, 2019 when the Proofs of Claim were filed.**