B1040 (FORM 1040) (12/15)

## ADVERSARY PROCEEDING COVER SHEET
(Instructions on Reverse)

**ADVERSARY PROCEEDING NUMBER**
(Court Use Only)

**PLAINTIFFS**

Jeremiah Vance

**DEFENDANTS** Jeffrey Wiens; WEDasC, LLC;
Joyce W. Lindauer, PLLC; Merlin Law Group, PA;
Medical Billing Corporate; Mec Solutions; Jonya Gilsson;
William camp (individual); William camp pc;
Medical practice solutions; Adrienne Villarreal

**ATTORNEYS** (Firm Name, Address, and Telephone No.)

6437 Southpoint Dr.
Dallas, tx 75248    (214)208-1257

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
- ☐ Debtor
- ☐ U.S. Trustee/Bankruptcy Admin
- ☒ Creditor
- ☐ Other
- ☐ Trustee

**PARTY** (Check One Box Only)
- ☐ Debtor
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor
- ☒ Other
- ☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Fraud 40 USC 123
Breach of Fiduciary Duty 29 USC 409
Breach of Contract 41 USC 6503

**FILED**

MAR 13 2024

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| FRBP 7001(1) – Recovery of Money/Property | FRBP 7001(6) – Dischargeability (continued) |
|---|---|
| ☐ 11-Recovery of money/property - §542 turnover of property | ☐ 61-Dischargeability - §523(a)(5), domestic support |
| ☐ 12-Recovery of money/property - § 547 preference | ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury |
| ☐ 13-Recovery of money/property - §548 fraudulent transfer | ☐ 63-Dischargeability - §523(a)(8), student loan |
| ☒ 14-Recovery of money/property - other | ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation |
| | (other than domestic support) |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien** | ☒ 65-Dischargeability - other |
| ☐ 21-Validity, priority or extent of lien or other interest in property | |
| | **FRBP 7001(7) – Injunctive Relief** |
| **FRBP 7001(3) – Approval of Sale of Property** | ☐ 71-Injunctive relief – imposition of stay |
| ☐ 31-Approval of sale of property of estate and of a co-owner – §363(h) | ☐ 72-Injunctive relief – other |
| **FRBP 7001(4) – Objection/Revocation of Discharge** | **FRBP 7001(8) Subordination of Claim or Interest** |
| ☐ 41-Objection / revocation of discharge - §727(c),(d),(e) | ☐ 81-Subordination of claim or interest |
| **FRBP 7001(5) – Revocation of Confirmation** | **FRBP 7001(9) Declaratory Judgment** |
| ☐ 51-Revocation of confirmation | ☐ 91-Declaratory judgment |
| **FRBP 7001(6) – Dischargeability** | **FRBP 7001(10) Determination of Removed Action** |
| ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims | ☐ 01-Determination of removed claim or cause |
| ☒ 62-Dischargeability - §523(a)(2), false pretenses, false representation, | **Other** |
| actual fraud | ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq. |
| ☒ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny | ☐ 02-Other (e.g. other actions that would have been brought in state court |
| **(continued next column)** | if unrelated to bankruptcy case) |

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☒ Check if a jury trial is demanded in complaint | Demand $ 89,301,118.92 |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR *Revolution Monitoring et al* | BANKRUPTCY CASE NO. *18-33730-HdH* | |
| DISTRICT IN WHICH CASE IS PENDING *Northern* | DIVISION OFFICE *Dallas* | NAME OF JUDGE *Everett* |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE *8/13/24* | PRINT NAME OF ATTORNEY (OR PLAINTIFF) *Jeremiah Vance* | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**IN THE UNITED STATES BANKRUPTCY
COURT FOR THE NORTHERN DISTRICT OF
TEXAS DALLAS DIVISION**

**FILED**

MAR 13 2024

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| REVOLUTION MONITORING, LLC | § | Case No. 18-33730-hdh |
| | § | |
| REVOLUTION MONITORING | § | Case No. 18-33731-hdh |
| MANAGEMENT, LLC | § | |
| | § | |
| REVOLUTION NEUROMONITORING LLC | § | Case No. 18-33732-hdh |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

| | | |
|---|---|---|
| Jeremiah Vance, | § | |
| | § | |
| *Individually* and *Derivatively* on behalf of the | § | |
| Liquidating Trustee and on behalf of the | § | |
| Liquidating Trust of Revolution Monitoring, | § | Adversary No. ~~24-03009~~ |
| LLC, Revolution Monitoring Management, | § | |
| LLC, and Revolution Neuromonitoring, LLC | § | |
| *Plaintiff,* | § | |
| v. | § | |
| | § | |
| Jeffery Mims (Trustee); | § | |
| | | |
| MEDarc, LLC; | | |
| | | |
| Joyce W. Lindauer, PLLC; | | |
| | | |
| Merlin Law Group, PA; | | |
| | | |
| Medical Billing Company, llc, | | |
| MCBIOM, llc, | | |
| Tonya Gilliam; | | |
| | | |
| William Camp Law Group, | | |
| William W. Camp, PC, | | |
| | | |
| Medical Practice Solutions, | | |
| Adrianna Villareal; | | |



## PLAINTIFF'S ~~FIRST REVISED~~ COMPLAINT

## INTRODUCTION

1.      This is an action by Jeremiah Vance (hereafter referred to as "Creditor")

Individually and Derivatively on behalf of the Liquidating Trust and Trustee of Revolution

Monitoring, LLC, Revolution Monitoring Management, LLC, and Revolution

Neuromonitoring, LLC (hereafter referred to as "Revolution") against all parties (*The

Defendants*) that were contracted to preform, manage, supervise or care for collections on

all Revolution's assets that were transferred to the management of Revolution's bankruptcy

plan Trust for monetary damages in the amount of $89,301,118.92.

2.      Revolution Monitoring LLC, prior to its bankruptcy, was a Texas Company

and its offices were located in 4925 Greenville Ave., Suite 200, Dallas, TX 75206, which is

located in the Northern District of Texas. Revolution Monitoring, LLC's current principal

place of business is 6437 Southpoint Dr., Dallas, TX 75248, which is located in the

Northern District of Texas. Revolution Monitoring Management LLC and Revolution

Neuromonitoring LLC are affiliates of Revolution Monitoring LLC.

3.      As explained more fully below, the Debtors' Second Joint Plan of

Reorganization (Dkt. No. 139) and Plan Supplement (Dkt No. 146) granted the Jeffery

Mims as Trustee the legal standing and fiduciary responsibility as manager of the Trust, to

increase the value of the Debtors' assets in pursuit of the collection of the Debtors' assets

and assigned claims against the Defendants, and to seek compensation for the services

Revolution rendered and which Revolution (and Revolution's Liquidating Trust) are owed.[1]

---

[1] The Revolution Monitoring, LLC bankruptcy petition was filed in the Northern District of Texas on September 27, 2018, and it is currently pending as case no. 3:18-bk-33730. The Revolution Monitoring Management bankruptcy petition was filed in the Northern District of Texas on October 5, 2018, and it is currently pending as case no. 3:18-

4.      Vance has legal standing to bring this complaint. Vance has legally acquired

the rights to six respective secured and unsecured creditor claims to the Reorganized

Debtors' Trust, that represent all remaining creditor claims being asserted in the Revolution

Bankruptcy. Vance is a non-managing beneficiary/owner of the Reorganized Debtors'

Liquidating Trust as the Debtors' bankruptcy plan states:

> 6.1 *The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the trust.*

5.      The Plaintiff therefore has legal standing under FRCP 23.1, as a non-

managing owner, to file a derivative action on behalf the Reorganized Debtors' Liquidating

Trustee against the Defendants, and to file a derivative action on behalf of the Reorganized

Debtors' Trust against the Trustee for damages.

## DISCOVERY

6.      Plaintiff intends to conduct discovery under Level 3 of TEX. R. CIV. P. 190.3.

## CLAIM FOR RELIEF

7.      Plaintiff seeks monetary relief of $89,301,118.92.

## FACTUAL BACKGROUND

### Medical Practice Solutions and Adrianna Villareal

8.      Adrianna Villarreal is the sole owner of Medical Practice Solutions, LLC

("MPS"), a medical billing and collections company formed in or around 2013.

9.      In or around May 2014, Revolution Monitoring contacted Ms. Villarreal

about potentially providing medical billing and collection services to Revolution.  Ms.

---

bk-33731. The Revolution Neuromonitoring, LLC bankruptcy petition was filed in the Northern District of Texas on October 5, 2018, and it is currently pending as case no. 3:18-bk-33732.

Villarreal represented to Revolution that MPS used a proprietary system of billing and collecting for medical services that was far superior to other billing companies, that MPS specialized in intra-operative neuromonitoring billing, and that MPS would collect a minimum of 80 percent of the rate established by MPS. She also represented that she had relationships with each of the payors, which insured a high percentage of recoveries.

10.    On or about May 29, 2014, Revolution and MPS entered into a Healthcare Billing and Collection Agreement (the "Agreement"), whereby MPS was to perform all medical billing, appeals, and collection services for Revolution. MPS was obligated by contract to handle all billing, appeals, and collection services for Revolution. MPS would receive a commission on all recoveries it made on behalf of Revolution.[2]

11.    On or about October 1, 2015, Revolution and MPS entered into an Amended Exclusive Healthcare Billing and Collection Agreement (the "Amended Agreement"), which extended and amended their previous agreement to add an exclusivity provision which stated that MPS would not provide its services to any other intra-operative neuromonitoring company unless the other provider had a significant number of claims for MPS (*i.e.*, more than 500 claims per month).[3]

12.    Over the course of the relationship, MPS did not recover anywhere close to the 80 percent that had been represented to Revolution before entering into the original agreement. Ms. Villarreal repeatedly made excuses for the low collection rates, and falsely stated that it was only a matter of time before numerous payments began rolling in because MPS was in the process of appealing all unpaid or partially paid claims. Because of Ms. Villarreal's false statements, Revolution reasonably relied on her fraudulent representations

---

[2] *Exhibit 1: MPS & Revolution Monitoring Billing & Collections Contract.*
[3] *Exhibit 2: MPS & Revolution Monitoring Billing & Collections Contract.*

and took no other actions to prevent its claims from disqualification by failure to timely appeal.

13.     On or about April 15, 2016, MPS notified Revolution in writing that it was terminating the Amended Agreement effective thirty days thereafter.[4] On May 18, 2016, MPS served Revolution with notice that it would no longer be collecting on Revolution's accounts receivable.[5]

14.     After the *Amended Agreement* was terminated, Revolution discovered that on a great number of occasions, Ms. Villarreal and MPS had failed to submit claims for payment, failed to appeal the denial of claims, filed claims incorrectly, failed to respond to follow-up requests for documentation and failed to respond to multiple demands from payors' fraud and investigation departments without notifying Revolution. All of these actions of error and omission caused the Trust's assets $25,124,989.32 in monetary damages for which the Creditors now seek recovery.[6]

15.     Revolution also discovered that Ms. Villarreal had caused MPS to terminate the *Amended Agreement* and stop collection efforts on Revolution's receivables for her own personal benefit and/or that of other entities of which she is an owner.  Upon information and belief, Ms. Villarreal caused MPS to terminate the *Amended Agreement* and cease collection efforts – despite MPS's monetary interest in continuing to pursue collections and earn commissions – to divert referral sources and patients to other entities which Ms. Villarreal had created to compete with Revolution.

16.     Ms. Villarreal also interfered with Revolution's contracts with its employees,

---

[4] *Exhibit 3: MPS Billing Termination Notice.*
[5] *Exhibit 4: MPS A/R Service Termination Notice*
[6] *Exhibit 5: Revolution Monitoring Claims Appellate Deadline Spreadsheet.*

including but not limited to Roma Robinson, Jason Earhardt and Marlena Callahan, by

soliciting the services of these Revolution employees to work for other entities which Ms.

Villarreal owns. Upon information and belief, Ms. Robinson and/or Ms. Callahan caused a

considerable number of Revolution's private documents to be shared with Ms. Villarreal

immediately prior to their departure from Revolution.

17.     Ms. Villarreal also interfered with Revolution's prospective business

relationships with referral sources.  Several of Revolution's usual sources of referrals,

including but not limited to Dr. Michael Elkanich, no longer referred surgeries to

Revolution and began referring surgeries to Ms. Villarreal's new entities which were

created to compete with Revolution.

18.     Ms. Villarreal also interfered with Revolution's prospective relationships

with insurance providers by causing MPS to fail to effectively pursue collections on

Revolution's behalf, thus causing Revolution to be "flagged" by insurers and rendering it

substantially more difficult to make successful collections for services provided by

Revolution.  Revolution has been noticed for audit by both United HealthCare and Blue

Cross Blue Shield for MPS's non-responsiveness to requests for additional information.

MPS failed to respond to the requests and failed to notify Revolution of the requests.

**A.  Breach of Contract**

19.     Revolution and MPS entered into the Amended Agreement, a valid,

enforceable contract.  MPS breached the contract on a number of occasions by failing to

perform medical billing, appellate, and collection services on Revolution's behalf.  MPS

failed to submit claims for payment, failed to appeal the denial of claims, filed claims

incorrectly, failed to respond to follow-up requests for documentation and failed to respond

to multiple demands from payors' fraud and investigation departments without notifying
Revolution. Revolution performed all conditions precedent to sue under the contract. As a
result of MPS's breach, Revolution sustained financial harm and lost the benefits expected
to be received from the Amended Agreement if MPS had performed as promised.
Revolution lost billable claims funds due to the actions and omissions of MPS and incurred
costs associates with hiring alternative medical billing and collection services.

**B.  Breach of Fiduciary Duty**

20.     As Revolution's medical billing and collections agents, MPS and Ms.
Villarreal owed Revolution certain fiduciary duties, including but not limited to the duty of
loyalty and good faith, duty to refrain from self-dealing, duty of fair and honest dealing and
duty of full disclosure. MPS and Ms. Villarreal breached each of these fiduciary duties
owed to Revolution for the reasons discussed in the paragraphs hereinabove. These
breaches resulted in substantial injury to Revolution and benefit to MPS and Ms. Villarreal.

21.     Moreover, as described in the paragraphs hereinabove, Revolution's injury
resulted from the fraud, malice and/or gross negligence of MPS and Ms. Villarreal.
Accordingly, Revolution seeks exemplary damages.

22.     Moreover, the actions of MPS and Ms. Villarreal constituting breach of
fiduciary duty were done so intentionally and were so grossly inappropriate that they
warrant disgorgement of all of the fees received by MPS under the *Amended Agreement*
and/or forfeiture of all contractual consideration received by MPS and Ms. Villarreal from
the inception of the relationship to the present.

**C.  Fraud**

23.     All foregoing paragraphs are incorporated by reference as though fully stated

herein.

24.    Ms. Villarreal, on behalf of MPS, made representations to Revolution about the medical billing and collections services that MPS would provide.  These representations were material to induce Revolution into entering into a contractual relationship with MPS. The representations were false, as evidenced by MPS's documented record of appeals.  Ms. Villarreal and MPS knew these representations were false at the time they were made, or made the representations recklessly, as a positive assertion, and without knowledge of its truth.  Revolution relied on the false representations and contracted with MPS.  This reliance caused substantial harm to Revolution, as MPS ultimately collected far less than the industry standard on Revolution's receivables, on most claims collected nothing, and failed to document nearly any timely appeals done at all.

**D.    Gross Negligence**

25.    All foregoing paragraphs are incorporated by reference as though fully stated herein.

26.    As Revolution's medical billing and collection agent, MPS owed Revolution a duty of care to perform its services in a reasonable manner that satisfied industry standards.  MPS acted negligently and failed to meet the standard of care for medical billing and collection service providers when it was providing said services to Revolution.  MPS's failure to satisfy its duty to Revolution proximately caused significant damage to Revolution, including but not limited to loss of the benefit of the bargain, out of pocket damages, and lost profits.

**E.    Tortious Interference with Contract (Villarreal)**

27.    All foregoing paragraphs are incorporated by reference as though fully stated

herein.

28.    Revolution had a contractual relationship with MPS. Ms. Villarreal was aware of this contractual relationship. Ms. Villarreal willfully and intentionally interfered with Revolution's contract with MPS by causing MPS to terminate the contract and cease collection efforts. Upon information and belief, Ms. Villarreal did so for her own personal benefit as the owner of businesses competing with Revolution. Ms. Villarreal's actions have caused substantial damages to Revolution.

29.    Revolution also had contractual relationships with its employees, including but not limited to Roma Robinson and Marlena Callahan. Ms. Villarreal was aware of these contractual relationships. Ms. Villarreal willfully and intentionally interfered with Revolution's contracts with its employees by soliciting these employees to work for other entities which she owns. Ms. Villarreal's actions have caused substantial damages to Revolution.

**F.   Tortious Interference with Prospective Business Relations (MPS and Villarreal)**

30.    All foregoing paragraphs are incorporated by reference as though fully stated herein.

31.    There was a reasonable probability that Revolution would have entered into business relationships with numerous prospective patients via its usual referral sources. Ms. Villarreal either acted with a conscious desire to prevent those relationships from occurring or knew the interference was certain or substantially certain to occur as a result of her conduct. Ms. Villarreal's conduct was independently tortious. The interference proximately caused Revolution's injury of lost business opportunities. Revolution suffered actual damages due to the loss of business opportunities.

**William Camp Law Group, William W. Camp, PC, William Camp;**

32.    On April 14th, 2016, William Camp executed a Representation Agreement with Revolution Monitoring and Jeremiah Vance on Cause No. DC-15-08225.  Upon Information and belief, William Camp ("Camp") is the owner of William W. Camp, P.C ("Camp, PC") d.b.a. Camp Law Group.[7]

33.    On or about April 22nd, 2016, pursuant to the William W. Camp, P.C. Representation Agreement,[8] Camp introduced John Kellogg ("Kellogg") to Revolution as his legal assistant in the Camp Law Group.[9]

34.    On May 15th, 2016, Revolution's account receivable servicer, Medical

---

[7] See *Exhibit 6: William Camp Corporationwiki,* and *Exhibit 7: William W. Camp P.C. Corporationwiki,* as evidence of William Camp's ownership of William W. Camp P.C. and business connection to The Camp Partnership, LLLP, John Kellogg, and Integrity Medical Billing, LLC.

[8] See pages 1 and 10 of *Exhibit 8: Revolution Monitoring - Camp Law Group Representation Agreement 4-14-16* as evidence of contract between Revolution and William Camp for corporate general counsel and representation on Cause No. DC-15-08225.

[9] See *Exhibit 9: Email Kellogg and Camp to Revolution Re Texas Legal Escrow, John Kellogg, and Sandy McCorquodale 4-22-18,* as evidence that at all times did Revolution understood both Sandy McCorquodale ("Sandy") and John Kellogg to be operating on its behalf as its legal counsel and representatives, pursuant to the paragraph regarding *Contract Lawyers* on pages 5-6 of *Exhibit 8* which states: *"From time to time lawyers who are not in Lawyer's firm ("contract lawyers") may preform services under this engagement in accordance with Lawyer's instructions and supervision... Client acknowledges, accepts and agrees to the use of the independent law firm AM Lawyers (Sandy McCorquodale), to be utilized as a contract law firm providing contract lawyers. Client further agrees that Lawyer is not restricted solely to the use of AM Lawyers as contract attorney(s), and further agrees and acknowledges that Lawyer may use any other contract lawyer at Lawyer's discretion."*

See *Exhibit 9* page 2 as evidence of John Kellogg's identification as an *"Assistant in the Camp Law Group."*

See *Exhibit 9* page 2 as evidence of Texas Legal Escrow, LLC's business relationship to William W. Camp, P.C. as identified as the company *"which maintains the Camp Law Group's Trust accounts."*

See *Exhibit 9* as evidence of Camp's intentional misrepresentation and misleading his client, Revolution, regarding the true identity of John Kellogg.

See *Exhibit 10: The Partnership Camp, LLLP Corporationwiki,* as evidence of Camp and Kellogg's undisclosed partnership in The Partnership Camp, LLLP.

See *Exhibit 11: Integrity Medical Billing, LLC Corporationwiki,* as evidence of Kellogg and Camp's undisclosed partnership as the undisclosed owners and directors of Integrity Medical Billing, LLC.

See *Exhibit 12: John Kellogg Corporationwiki,* and *Exhibit 13: Texas Legal Escrow, LLC Corporationwiki,* as evidence of Kellogg's ownership of Texas Legal Escrow, LLC. The aforementioned exhibits constitute material evidence not disclosed by Camp in Cause No. DC-17-14685, filed under the shell company Integrity Medical Billing, LLC. Camp's failure to disclose constitutes a fraud against the court. The exhibits constitute material evidence of Camp's collusion to unjustly enrich himself by illegally converting the Revolution account receivables for his own benefit.

See Camp's instruction in *Exhibit 9* which states, *"Please always copy Sandy and campstaff (Kellogg) on communications as shown in the CC line."* as proof of the extending attorney-client relationship.

Practice Solutions, terminated its account receivable billing and collections contract with
Revolution Monitoring.

35.   On June 2nd, 2016, at the introduction, advice, and recommendation of
Camp, Revolution executed an account receivables collections contract with Integrity
Medical Billing, LLC ("IMB").[10]   William Camp failed to disclose to Revolution both his
ownership interest and ethical conflict of interest in Integrity Medical Billing.[11]

36.   In June 2016, responding to the legal advice and direction of Camp as
General Counsel to Revolution Monitoring, Revolution authorized Camp as Corporate
General Counsel to create a corporate mailbox address on behalf of Revolution and in
Revolution's name, allegedly for the purpose of more reliably receiving account receivable
collections. Acting on behalf of Revolution as General Counsel, Camp created and
registered a Revolution mailbox at: QuickShip Mail & Business Center, 209 S. Shady
Shores Rd., 300-176, Lake Dallas, Texas 75065 ("Shady Shores"). Revolution's office

---

[10] *See Exhibit 14: Revolution Monitoring - Integrity Medical Billing Business Associate Agreement 6-2-16*; *Exhibit 15: Revolution Monitoring - Integrity Medical Billing Non-Disclosure Agreement 6-2-16*; and *Exhibit 16: Integrity Medical Billing IRS Form W-9 8-9-16,* as evidence of the business relationship between Revolution and Integrity Medical Billing for Revolution's receivables collections services.
See *Exhibit 17: Email Camp to Revolution Referral to Integrity Medical Billing 4-20-16,* as evidence of Camp's referral to his own company in which he did not disclose an ownership interest to his client.

[11] *See Exhibit 11: Integrity Medical Billing, LLC Corporationwiki,* as evidence of Camp's ownership interest in Integrity Medical Billing and therefore evidence of Camp's undisclosed ethical conflict. *Exhibit 11* shows evidence that Integrity Medical Billing is in fact owned and managed by William Camp, and owned and/or directed by John Kellogg. During the tenure of the contracts between Revolution, Camp, and IMB, Camp not only misrepresented his ownership interest in IMB but also misrepresented John Kellogg's true identity as the director of IMB. Camp, did in fact intentionally mislead Revolution by an intentional failure to disclose the true nature of his business relationship with John Kellogg and IMB. But if not for Camp and Kellogg's misrepresentation of Kellogg as a partner of Camp's firm, Revolution would not have given Kellogg access to proprietary corporate information, which information has now been used by plaintiff, Camp, Kellogg, and IMB in a premediated and coordinated effort to cause Revolution irreparable damages; by tortuously interfering with its ongoing business operations and contracts, and by unjustly enriching themselves by illegally converting Revolution's receivables. At all times did Camp and Kellogg represent to Revolution that Kellogg was a legal assistant in the Camp Law Group of William W. Camp, P.C. At no time did Camp or Kellogg disclose to Revolution that Kellogg was the director of either Texas Legal Escrow nor Integrity Medical Billing, nor did Camp or Kellogg at any time disclose to Revolution that Camp himself was also a principal owner of either Texas Legal Escrow nor Integrity Medical Billing, the same receivables collections company to which Camp did simultaneously refer Revolution with attorney-client advice given under attorney-client privilege with no disclosure of any such conflict.

manager, Leslie Helm, would meet with John Kellogg weekly to exchange the mail.[12] On

about June 22nd, 2016, Revolution authorized the reimbursement of mail shipping fees

expensed on Revolution mail by Integrity Medical Billing.[13]

37. On July 7th, 2016, both Belinda Kelly ("Kelley"), the certified CPT coder,

alleged director, and alleged owner of Integrity Medical Billing; and Camp informed

Revolution that a $14 million aggregate settlement had been reached on collections of

Revolution's outstanding UnitedHealthcare receivables.[14] Although IMB & Camp

represented to Revolution that a settlement with UnitedHealthcare had been reached, a

settlement check was never received by Revolution and both Kelly and Camp began

making fabricated and misleading excuses to Revolution to explain the delay.[15]

38. On August 3rd, 2016, Integrity Medical Billing provided Revolution the

results of a two-month long audit of Revolution's account receivables, for which

Revolution paid $15,000.00. IMB provided Revolution an Audit Summary verifying the

integrity and collectability of Revolution's account receivables.[16]

39. On August 12th, 2016, due to the failure of IMB to perform under contract,

Revolution was forced to seek private financing to sustain the demands of ongoing business

---

[12] See *Exhibit 18: Email Kellogg to Revolution Re Mail at Shady Shores 7-31-17,* as evidence of the regular ongoing attorney-client pattern of delivery of all Revolution mail received at Shady Shores by John Kellogg to Revolution's offices.

[13] See *Exhibit 19: Revolution Monitoring - Integrity Medical Billing Mail Service Fee Approval Letter 6-22-16.*

[14] See *Exhibit 20: Email Integrity Medical Billing to Revolution Re UnitedHealthcare-Revolution Settlement 7-1-16* and *Exhibit 21: Email Revolution to Integrity Medical Billing and Camp Re UnitedHealthcare-Revolution Settlement 7-7-16,* as evidence of the missing *$14 million* settlement check between Revolution and UnitedHealthcare.

[15] Revolution was informed by Belinda Kelly, as a fabricated and misleading excuse for the delay in Revolution's receipt of the United Healthcare settlement check, that the brother of the unidentified UnitedHealthcare claims adjuster, who authorized the settlement, had been murdered in the *Black Lives Matter Protest of July, 7th 2016 in Dallas, Texas,* and was consequently taking an employed leave of absence from the company. Upon information and belief, Camp and Kelly colluded and fabricated this story to intentionally mislead Revolution and unjustly enrich themselves by illegally converting Revolution's receivables.

[16] See *Exhibit 22: Revolution Monitoring - Integrity Medical Billing Account Receivable Audit Summary 8-3-16.*

operations and did in fact execute a Loan Security Agreement with John McHalffey ("McHalffey"), upon which a UCC was filed with the Secretary of State in Texas on Revolution Monitoring's account receivables. But if not for IMB's failure to perform under contract, Revolution would not have been forced into financing to sustain normal business operations.

40.    On or about 8 weeks after Revolution accepted the July 7th, 2016, $14 million settlement offer from United Healthcare, Revolution's Executives began expressing to Camp under attorney-client privilege, votes of no confidence in the underperforming services and misleading excuses of Belinda Kelly and Integrity Medical Billing regarding the "mysterious" delay of the $14 million United Healthcare settlement check. On August 25th, 2016, with the privileged knowledge that Revolution was in the process of interviewing replacement collection contractors to service its account receivables, and with the persistent failure of Camp to disclose his own conflicted financial interest in IMB, Camp advised, as Revolution General Counsel, and in fact insisted, that Revolution negotiate the execution of a receivables collections contract directly with William W. Camp, PC.[17]

41.    On September 8th, 2016, Camp, insisted Revolution renegotiate the April 4th, 2016, William W. Camp, PC Representation Agreement [Exhibit 8].[18]

42.    On September 19th, 2016, after two months of misleading excuses for the

---

[17] See Exhibit 23: William Camp Law Group Collections Contract 8-25-16.
[18] See Exhibit 24: William Camp Law Group Representation Agreement 9-8-16 as evidence of a renegotiated agreement between Revolution and Camp for General Counsel and legal representation on Cause No. DC-15-08225, Cause No. DF-15-13236, and Cause No. DC-16-04372 (causes which were all related by common parties). See the "Conflict Resolution" paragraph on pages 9-10 of Exhibit 24 as evidence that Camp has damaged Revolution by breaching the contractually binding terms of mandatory and confidential arbitration, by bringing Cause No DC-18-08996 against Revolution through the subversion of a shell company, Texas Legal Escrow, with whom Revolution never had a contract.

delay of Revolution's receipt of a $14 million settlement check from United Healthcare,

and the failure of all other collections efforts, Revolution's Board of Directors terminated

its receivables collections contract with Integrity Medical Billing.[19]  To date, Revolution

has not received the missing $14 million United Healthcare settlement check, nor has been

provided a reasonable explanation by Integrity Medical Billing for its persistent absence.[20]

43.    On October 3rd, 2016, under the duress of Camp's threat of withdrawal from

Cause No. DC-15-08225, Camp insisted Revolution execute an account receivable

collection contract with William W. Camp, PC.[21]

44.    On November 2nd, 2016, since William W. Camp, P.C. does not employ a

certified healthcare billing and coding specialist, it became necessary for Revolution to

execute a Medical Billing Services Contract with Medical Billing Collection Services IOM,

LLC ("MBCIOM") to assist Camp, PC in the faithfully diligent execution of its contracted

services, pursuant to the terms of subcontracted supervision in the Camp, PC Collections

Contract.[22]

45.    On November 22nd, 2016, due to the failure of IMB to perform under

---

[19] See *Exhibit 25: Revolution Monitoring - Integrity Medical Billing Termination Notice 9-19-16.*
[20] Integrity Medical Billing, William Camp, and John Kellogg would go on to show a pattern of fraud, gross negligence, deceit, conversion, and unjust enrichment regarding Revolution's account receivables.
[21] See *Exhibit 26: Revolution Monitoring - William Camp, PC Collections of Accounts Receivable Contract 10-3-16.*
[22] See *Exhibit 26,* page 2 as evidence of the contractually obligated scope of services, as well as evidence that Camp was already in receipt of receipt of the contracted subject matter: *"Collection of the approximately 1,700 historical accounts receivable on behalf of Revolution Monitoring, LLC, and Revolution Monitoring Management, LLC, as detailed on the spreadsheets <u>previously exchanged</u>... Lawyer will attempt to represent the Client <u>effectively and professionally</u> in this matter. Lawyer cannot guarantee success or any given result but Lawyer will strive to represent the Client's interests vigorously and efficiently in accordance with the Rules of Professional Responsibility."* Camp failed to preform his contracted services of *account receivable collections* neither reasonably *vigorously,* nor reasonably *efficiently,* nor in accordance with the *Rules of Professional Responsibility.* Camp failed to document any obligatory appellate work on Revolution's account receivables whatsoever.
See *Exhibit 26,* page 6 as evidence of contractually obligated *supervision* of subcontracted collection servicing contractors by Camp, PC: *"Client recognizes and understands that the Lawyer's representation of the Client in this matter may require the retention of collection companies or other law firms to work under Lawyer's supervision in effecting the collections."*
See *Exhibit 27: Revolution – MBCIOM Medical Billing Services Contract 11-2-16.*

contract, in addition to the loan executed by McHalffey, Revolution was forced to seek

additional financing to sustain the budgetary demands of ongoing business operations and

had no choice but to execute a receivables factoring loan with Xynergy Healthcare Capital

II, LLC ("Xynergy"), upon which a UCC was filed with the Texas Secretary of State on

Revolution Monitoring's account receivables. But if not for IMB's failure to perform under

contract, Revolution would not have been forced neither into private lending with

McHalffey nor into factoring lending with Xynergy to sustain normal business operational

budgetary demands.

46.     On February 9th, 2017, William W. Camp, P.C. sent Revolution a written

demand to assign to Texas Legal Escrow, LLC the collateral secured by the UCC Financing

Statement 17-0002682531, and did in fact accept for payment in full of all debts owed for

legal fees contracted under the William Camp Law Group Renegotiated Representation

Agreement 9-8-16 [Exhibit 24] and UCC Financing Statement 17-0002682531. In perfected

compliance with Camp's demands for debt repayment, Revolution executed the entire

requested collateral assignment to TLE, valued by Camp himself at $8,805,000.00.[23] Camp

accepted the collateral assignment as payment in full of all debts and withdrew the UCC

TLE filed against Revolution.[24]

47.     On March 2nd, 2017, at Camp's demand, Revolution executed an *Addendum
to the Collateral Assignment [Exhibit 28]* of receivables assigned to TLE.[25] Camp again

accepted *the Collateral Assignment Addendum [Exhibit 31]* as payment in full of all debts

demanded under the Texas Legal Escrow UCC and/or under the *William W. Camp, PC*

---

[23] See *Exhibit 28: Revolution Monitoring - Texas Legal Escrow Executed Collateral Assignment 2-17-17.*
[24] See *Exhibit 29: Email Camp to Revolution Confirming Collateral Assignment Satisfies UCC Demand 2-10-17.*
[25] See *Exhibit 30: Email Camp to Revolution Re Collateral Assignment Addendum 3-2-17.*
See *Exhibit 31: Revolution Monitoring - Texas Legal Escrow Executed Collateral Assignment Addendum 3-2-17.*

*Representation Agreement [Exhibit 24].*[26]

48.    On March 13th, 2017, Revolution sent Camp a list of outstanding receivables with an instruction to initiate appeals and litigation.[27]

49.    On April 5th, 2017, at Camp's demand, Revolution executed a *Second Addendum to the Collateral Assignment [Exhibit 28]* of receivables assigned to TLE, pursuant to Camp's own spreadsheet of receivable collateral value evaluation. Camp again accepted the *Collateral Assignment Second Addendum [Exhibit 34]* as payment in full of all debts demanded under the Texas Legal Escrow UCC and/or under the *William W. Camp, PC Representation Agreement [Exhibit 24].*[28]

50.    In May 2017, Revolution contracted Quality Control Services, LLC to audit, correct, resubmit, and collect its account receivables. After finding many billing and coding irregularities and errors being committed by MBCIOM under the supervision of William W. Camp, P.C., Revolution's executives began expressing to Camp, MBCIOM, and Xynergy votes of no confidence in both Camp's and MBCIOM's collections performance and unacceptable excuses for delays in Revolution's revenue cycle.

51.    On May 24th, 2017, MBCIOM sent Camp an additional spreadsheet of Revolution's receivables with instruction to initiate appeals and litigation.[29] Camp took no action whatsoever and failed to produce documentation of any obligatory appellate work at all. Camp's failure to preform contracted collection services and failure to document timely appellate submissions directly caused the Trust's assets' monetary damages of

---

[26] See *Exhibit 32: Email Camp and Revolution Confirming Collateral Assignment Addendum Satisfies UCC Demand 3-4-17.*
[27] See *Exhibit 33: Email Revolution to Camp with Receivables Spreadsheet and Instruction to Collect 3-13-17.*
[28] See *Exhibit 34: Revolution Monitoring - Texas Legal Escrow Executed Collateral Assignment Second Addendum 4-5-17.*
[29] See *Exhibit 35: Email MBCIOM to Camp Revolution Claims for Litigation 5-24-17.*

$48,517,795.20, for which the Creditors now seeks the remediation to which they are legally entitled.[30]

52.    On or about June 2nd, 2017, Texas Legal Escrow, despite having no contract with Revolution, and despite Camp having already been repaid in full by accepted Collateral Assignments, refiled a UCC with the Secretary of State in Texas on Revolution Monitoring's $91,001,118.92 million dollar account receivables.

53.    On August 7th, 2017, due to billing malpractice and failure to document timely appeals, Revolution terminated its billing and collections contract with MBCIOM.

54.    On August 8th, 2017, despite having failed to document timely appeals on any claims whatsoever, Camp again insisted that Revolution renegotiate his *Collections Contract [Exhibit 26]* and insisted that Revolution renegotiate a new Collections Contract with Integrity Medical Billing to provide the medical coding, billing, appeals, and collection services for Revolution's account receivables under the supervision of a newly renegotiated Collections Contract with William W. Camp, PC.[31]

55.    On August 19th, 2017, Camp resumes renegotiations on a collections contract with Revolution and submits a proposal on August 29th, 2017, which renegotiations fail to reach an agreement.[32]

56.    On August 30th, 2017, Revolution issued a demand to Camp for a payoff letter and a demand for an accounting of collections received on the February 27th, 2017 collateral assignment of receivables from Revolution to TLE on behalf of William W.

---

[30] See *Exhibit 5, Revolution Monitoring Claims Appellate Deadline Spreadsheet.*
[31] See *Exhibit 36: Email Camp and Revolution Renegotiate Collections Contract 8-8-17.*
[32] See *Exhibit 37: William Camp Law Group, P.C. Renegotiated Collections Contract 8-29-17*; and *Exhibit 57: Email Camp to Revolution Renegotiated Collections Contract Proposal 8-29-17.*

Camp, P.C., and the multiple subsequent addendums to the assignment. Upon information

and belief, both Camp and Xynergy have misrepresented a true accounting of collections on

these receivables for the purpose of conversion and unjust enrichment.[33]

57.    Upon information and belief, when collections contract renegotiations

between Revolution and Camp failed, Camp intentionally sabotaged the performance of the

*Wind Down Forbearance Agreement* executed Xynergy and Revolution Monitoring by

slandering Revolution's executives and Revolution to Xynergy, and refused to deliver

Revolution collections and mail that was received by William W. Camp, PC and/or

Integrity Medical Billing at the Revolution Shady Shores Address; and began to collude

with Xynergy to unjustly enrich himself by seeking to illegally convert Revolution's

account receivables into his own ownership because of the lucrative value he had sought in

earning off the attempted renegotiations of the William W, Camp, PC Collections Contract

on Revolution's $91,001,118.92 of uncollected medical receivables.[34]

---

[33] See *Exhibit 38: Email Revolution to Camp Re Request for Accounting of Collateral Assignment Errors 8-29-17*;
and *Exhibit 39: Email Thread Revolution to Camp Demand for Texas Legal Escrow Payoff Letter and Accounting of
Assignment 8-30-17.*

Both Camp and Kellogg will refuse to respond to any and all repeated attempts of contact by his client, Revolution,
after contract negotiations failed on August 29th, 2017, until emailing Revolution Monitoring a courtesy copy of DC-
18-08996 nearly a full year later on 7-13-18. Camp's actions torturously interfered with Revolution's normal and
ongoing business operations, contracts, and revenue. Instead, of remitting his client's claim payments received by
mail, at the mailbox he set up, in accordance with his ethical obligations as Revolution's attorney, Camp chose to
file DC-17-14685 against Revolution, concealed under the shell company of Integrity Medical Billing. Camp
misleads the court of DC-17-14685 by his failure to disclose the true interests of the principal parties of IMB in
paragraphs 16 and 17 of page 4 of *Exhibit 62* which patently misrepresents, *"Integrity Medical is in the position of
an innocent and disinterested stakeholder faced with multiple claims and incidental costs. Integrity Medical neither
has nor claims an interest in the checks being held by it, except for reimbursement of its attorney's fees and
expenses as may be allowed by law, and which Integrity Medical has at all times been willing to deliver to whoever
is properly entitled to possession of the subject checks."* Integrity Medical Billing is neither an *"innocent nor
disinterested stakeholder"* nor is a party without a *"claim or interest in the checks."* IMB was in fact a shell
company acting as an agent for William W. Camp, P.C. and Texas Legal Escrow. Camp fraudulently and illegally
withheld Revolution's checks from collections and all mail received at Revolution's former Shady Shores address.
[34] See *Exhibit 40: Email Xynergy and Camp Verifying Collusion 9-7-17*, as evidence of collusion between Camp and
Xynergy to tortuously interfere with Revolution's normal and ongoing collections, referrals, and business contracts;
to intentionally sabotage the performance of the *Revolution – Xynergy Wind Down Agreement [Exhibit 63].*

58. On September 6th, 2017, Revolution contracted Merlin Law Group, P.A. ("Merlin") for account receivable appeals, litigation, and collection services.[35]

59. On September 7th, 2017, pursuant to the budgetary terms of the *Revolution-Xynergy Wind Down Agreement [Exhibit 63]*, Revolution contracted Integrity Medical Management, LLC ("IMM") for business and operations management services.

60. On September 8th, 2017, Revolution sent notice of termination of the *Revolution – William W. Camp, P.C. Account Receivable Collections Contract [Exhibit 26]* to William Camp.[36]

61. On September 11th, 2017, Revolution instructed MBCIOM to transition all billing and collections data to Integrity Medical Management by the end of its contractually obligated 90-day termination window. MBCIOM refused to transition Revolution's proprietary billing and collections data, denied Revolution access to its own billing and collections data and appellate records stored in Navicure billing software and kept elsewhere, directly causing $37,626,049.60 in monetary damages to the Trust's assets, and torturously interfered Revolution's ongoing business operations and contracts.[37] Revolution is legally entitled to remedy from MBCIOM for said damages.

62. On October 3rd, 2017, Revolution sent Camp a written demand to remit and deliver all mail and checks being held Revolution's former Shady Shores address.[38] Camp refused to respond whatsoever, nor did he remit any of his client's mail. QuickShip Mail & Business Center also refused to release Revolution's mail, informing Revolution that Revolution's own mail could only be released to the owner of the mailbox, John Kellogg.

---

[35] See *Exhibit 41: Revolution Monitoring - Merlin Law Firm Collections Contract 9-6-17.*
[36] See *Exhibit 42: Email Revolution to Camp Notice of Collections Contract Termination 9-8-17.*
[37] See *Exhibit 43: Email Revolution to MBCIOM Notice of Transition to Integrity Medical Management 9-11-17.*
[38] See *Exhibit 44: Email Revolution to Camp Demand for Shady Shores Revolution Mail 10-3-17.*

John Kellogg also refused to respond to requests to remit Revolution's mail.

63.   On November 9th, 2017, Revolution sent Camp an additional written demand to remit and deliver all mail and checks being held its previous Shady Shores address.[39] Camp did not respond, nor did he remit any of his client's mail. Camp responded to his client's demand for mail by filing Cause No. DC-17-14685 on November 15th, 2017, against Revolution under the concealment from the court through his partnership with John Kellogg and the shell company, Integrity Medical Billing.[40]

64.   Upon information and belief Camp continued to collude with Xynergy to unjustly enrich himself by illegally converting Revolution's account receivables through an attempted unjust foreclosure of a debt already repaid while simultaneously torturously interfering with Revolution's ongoing business operations and contracts by withholding all receivable collection checks and other mail from delivery to his client.[41]

65.   On March 20th, 2018, after failing to preform, Merlin Law Group terminated its litigation and collections contract with Revolution Monitoring.

---

[39] See *Exhibit 45: Email Revolution to Camp Demand for Shady Shores Revolution Mail 11-9-17.*
[40] See *Exhibit 46: Integrity Medical Billing v Revolution Monitoring et al. DC-17-14685 10-27-17,* pages 3 & 4, paragraphs 13, 16, & 17, as evidence that Camp perpetrated a fraud on the court by attempting to unjustly enrich himself by illegally converting Revolution collections, laundered through the concealment of the shell company, Integrity Medical Billing, LLC: *"On the other hand, Jeremiah Vance, the president of Revolution, Revolution Neuro, and Revolution Management claims that the payments are owed to his company and has demanded that they be forwarded to him and not Xynergy. Indeed, **Mr. Vance has threated litigation against Integrity Medical** if it does not comply with his demand... **Integrity Medical is in the position of an innocent and disinterested stakeholder** faced with multiple claims and incidental costs. **Integrity Medical neither has nor claims an interest in the checks** being held by it, except for reimbursement of its attorney's fees and expenses as may be allowed by law, and which Integrity Medical has at all times been willing to deliver to whoever is properly entitled to possession of the subject checks."* Clearly, *William Camp,* the owner of *William W. Camp, PC [Exhibit 7],* and his partner, *John Kellogg [Exhibits 8 & 9],* are the same and true owners and operators of *Integrity Medical Billing [Exhibit 10],* and are also the same and true owners and operators of *Texas Legal Escrow [Exhibit 12],* who have explicitly claimed to be alleged *interested UCC stakeholders with a prioritized claim and interest in Revolution's collection checks* on page 4, paragraph 12, of *Plaintiff's Original Petition 7-11-18: "TLE is the holder a security interest in which the Revolution Defendants owe a secured debt."* Therefore, Camp's petition in Cause No. DC-17-14685 was plead in bad faith and with intent to defraud the court and irreparably damage Revolution Monitoring.
[41] See *Exhibit 47, Plaintiff's Original Petition in DC-18-08996, Exhibit C,* as evidence of Camp's attempt at unjust enrichment by conversion of Revolution's account receivables through a fraudulently filed foreclosure.

66.     On July 13th, 2018, after eleven months of refusal to respond to any and all attempts at contact by his client, Revolution was emailed a letter and a "courtesy copy" of Plaintiff's Original Petition in Cause No. DC-18-08996, by William Camp.[42]

**MBCIOIM, LLC and Tonya Gilliam**

67.     Tonya Gilliam is the sole owner of MBCIOM, LLC (Medical Billing Company "MBCIOM"), a medical billing, appeals, and collections company.

68.     On November 2nd, 2016, Revolution and MBCIOM entered into a Healthcare Billing, Appeals and Collection Agreement (the "Agreement"), whereby MBCIOM was to perform all medical billing, appeals, and collection services for Revolution. MBCIOM was obligated by contract to handle all billing, appeals, and collection services for Revolution.  MBCIOM would receive a commission on all recoveries it made on behalf of Revolution.

69.     Over the course of the relationship, MBCIOM did not recover anywhere close to the projections that had been represented to Revolution before entering into the original agreement.  Ms. Gilliam repeatedly made fraudulent excuses for the low collection rates, and falsely stated that it was only a matter of time before numerous payments began rolling in because MBCIOM was in the process of appealing all unpaid or partially paid claims. Because of Ms. Gilliam's false statements, Revolution reasonably relied on her fraudulent representations and took no other actions to prevent its claims from disqualification by failure to timely appeal.

70.     In May 2017, Revolution contracted Quality Control Services, LLC to audit,

---

[42] See *Exhibit 48: Letter Camp to Revolution Courtesy Copy of TLE v Revolution DC-18-0899 7-13-18*.
Also see *Exhibit 49: Email Vance to Camp Re Refuse to Communicate with Client 11-17-17*, as evidence of Camp's intentional acts of bad faith and torturous interference with Revolution's ongoing business operations and contracts.

resubmit, and collect its account receivables. After finding many billing and coding

irregularities and errors being committed by MBCIOM, Revolution's executives began

expressing to MBCIOM votes of no confidence in their collection performance and

unacceptable excuses for delays in Revolution's revenue cycle.

71.    On September 11th, 2017, Revolution instructed MBCIOM to transition all

billing and collections data to Integrity Medical Management by the end of its contractually

obligated 90-day termination window. MBCIOM refused to transition Revolution's

proprietary billing and collections data, denied Revolution access to its own billing and

collections data and appellate records stored in Navicure billing software and kept

elsewhere, directly causing $37,626,049.60 in monetary damages to the Trust's assets, and

torturously interfered Revolution's ongoing business operations and contracts.[43] The

Creditors are legally entitled to remedy from MBCIOM for said damages.

72.    After the Agreement was terminated, Revolution discovered that on a great

number of occasions, Ms. Gilliam and MBCIOM had failed to submit claims for payment,

and failed to appeal the denial of claims, filed claims incorrectly, failed to respond to

follow-up requests for documentation. All of these actions of error and omission directly

caused the Trust's assets $37,626,049.60 in financial damages.[44]

**Merlin Law Group and Jeffery Greyber**

73.    On September 6th, 2017, Revolution and Merlin Law Group, P.A.

("Merlin") entered into a Healthcare Billing, Appeals, Litigation and Collection Agreement

(the "Agreement"), whereby Merlin was to perform all medical billing, appeals, litigation

and collection services for Revolution. Merlin was obligated by contract to handle all

---

[43] See *Exhibit 43: Email Revolution to MBCIOM Notice of Transition to Integrity Medical Management 9-11-17.*
[44] See *Exhibit 5: Revolution Monitoring Claims Appellate Deadline Spreadsheet.*

billing, appeals, litigation and collection services for Revolution.  Merlin would receive a
commission on all recoveries it made on behalf of Revolution.

74.    Over the course of the relationship, Merlin did not recover anywhere close to
the projections that had been represented to Revolution before entering into the original
agreement.  Mr. Greyber repeatedly made fraudulent excuses for the lack of production, and
falsely stated that it was only a matter of time before numerous payments began rolling in
because Merlin was in the process of appealing all unpaid or partially paid claims. Because
of Mr. Greyber's false statements, Revolution reasonably relied on his fraudulent
representations and took no other actions to prevent its claims from disqualification by
failure to document timely appeals.

75.    On March 20th, 2018, after failing to preform, Merlin Law Group terminated
its litigation and collections contract with Revolution Monitoring. After the Agreement was
terminated, Revolution discovered that on a great number of occasions, Mr. Greyber and
Merlin had failed to submit claims for payment, and failed to appeal the denial of claims,
and failed to respond to follow-up requests for documentation. All of these actions of error
and omission directly caused the Trust's assets $18,226,015.20 in financial damages.[45]

**Jeffery Mims**

76.    When Revolution's bankruptcy attorney, Joyce Lindauer, submitted the
Revolution's bankruptcy plan, she was informed of all assets that Revolution had preserved
which consisted of approximately 2,000 insurance claims for medical services preformed,
valued at $91,001,118.92; and assets which also consisted of tort claims for damages
caused by professional billing negligence, malpractice, fraud, gross negligence, and failure

---

[45] See *Exhibit 5: Revolution Monitoring Claims Appellate Deadline Spreadsheet.*

to document timely appeals by its billing contractors: Medical Practice Solutions (MPS)
and Medical Billing Company IOM (MBCIOM), William Camp, P.C. (Camp), and Merlin
Law, P.A. (Merlin).  Revolution had preserved its claims for billing negligence and
malpractice, against MPS in *Defendant's Counterclaims and Cross-Claims* filed Cause No.
DC-16-14146.[46]

77.     Under Revolution's bankruptcy plan, the Creditors are *"treated as grantors
and owners of the trust" (6.15). The Liquidating Trust shall be established for the purpose
of liquidating and distributing the Liquidating Trust Assets, for the benefit of the
Beneficiaries" (6.3).* The Trustee, Jeffrey Mims ("Mims") had the same fiduciary standard
as any corporate executive to faithfully and responsibility administer Revolution's
bankruptcy plan for the benefit of the Creditors.

78.     Under paragraph 5.8 of Revolution's bankruptcy plan, the Trustee had a
responsibility to the Creditors to make a reasonable effort to maximize the value of all
assets for the benefit of the Creditors:

> *The Liquidating Trustee shall also pursue any and all Avoidance Actions, claims,
> causes of action or enforceable rights of the Debtors against third parties, or
> assertable by the Debtors on behalf of Creditors, its Estate, or itself for recovery,
> turnover or avoidance of obligations, or preferential or fraudulent transfers of
> property or interests in property and other types or kinds of property or interests in
> property recoverable or avoidable pursuant to Chapter 5 or other sections of the
> Bankruptcy Code or any applicable law including, without limitation, 11 U.S.C. §§
> 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553. Any
> and all claims or causes of action of the Debtors or its Estate relating to any pre- or
> post-petition activities against any one or more of any entity or person related to,
> owned by or affiliated with any current or former professionals of the Debtors*

---

[46] *Exhibit 44: Revolution Monitoring's First Amended Counterclaims and Original Cross-Claims, DC-16-14146.*

The trustee either knowingly or recklessly falsely denied, in gross mismanagement, the existence of this asset and
the other assets for billing appellate record malpractice, while in contradiction also admitting, at the same time,
knowledge of billing records malpractice from the inception of the bankruptcy plan: "*Those accounts receivable
were the only post-confirmation assets of the Revolution estates.*" (*Exhibit 57: Revolution Monitoring Bankruptcy -
Email Trustee Verifying Biller Malpractice 2 6-13-23).*

*(including, without limitation, legal, accounting, tax advisors or consultants) including, without limitation, claims or causes of action for: (i) breaches of fiduciary duty; (ii) fraud or fraudulent inducement; (iii) negligence; (iv) fraudulent or negligent misrepresentations; (v) legal, accounting or other professional negligence or malpractice; (vi) illegal dividends or payments received; (vii) civil conspiracy; (viii) fraudulent insurance acts; (ix) violations of any consumer protection act or deceptive trade practice act; (x) unjust enrichment; (xi) breach of contract; (xii) tortious interference with contracts or prospective relations; (xiii) deceit by misrepresentation or concealment; (xiii) common law fraud; (xiv) corporate waste; (xv) deepening insolvency; (xvi) alter ego; and (xvii) embezzlement. Any and all claims or causes of action of the Debtors or its Estate relating to any pre- or post-petition activities against the Debtors' former officers, directors, principals or advisors; and any current or former professionals of the Debtors (including, without limitation, legal, accounting, tax advisors or consultants) including, without limitation, claims or causes of action for: (i) breaches of fiduciary duty; (ii) fraud or fraudulent inducement; (iii) negligence; (iv) fraudulent or negligent misrepresentations; (v) legal, accounting or other professional negligence or malpractice; (vi) illegal dividends or payments received; (vii) civil conspiracy; (viii) fraudulent insurance acts; (ix) violations of any consumer protection act or deceptive trade practice act; (x) unjust enrichment; (xi) breach of contract; (xii) tortious interference with contracts or prospective relations; (xiii) deceit by misrepresentation or concealment; (xiii) common law fraud; (xiv) corporate waste; (xv) deepening insolvency; or (xvi) alter ego; and nothing shall estop the Debtors or Reorganized Debtors from asserting claims or causes of action just because they were not scheduled or described in detail in the Debtors' Schedules or Disclosure Statement. To the extent that such Claims are not the collateral of Xynergy such Claims shall be collected for the benefit of the Allowed Priority Claims and the Allowed Unsecured Claims in these cases.*

79.    The Trustee failed to enforce compliance with Revolution's bankruptcy plan.

On February 27th, 2020, the trustee was contacted to remedy non-compliance with the plan,

pursuant to the Trustee's obligations under section 14 of the plan as quoted here below:

*14.3 To adjudicate, decide or resolve any and all matters related to the Accounts Receivable, including an cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Accounts Receivable.*
*14.4 To adjudicate, decide or resolve any matters related to: (a) rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom and (b) any dispute regarding whether a contract or lease is or was executory or expired in connection with Debtor's estate and/or implementation of the Plan.*

*14.15 To issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan.*

*14.16 To consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order.*

80.    The Trustee was notified of Medarc, LLC's non-compliance under the plan regarding payments to the Debtor's manager and representative in the amount of $2,916.66/month, as a reasonable and necessary cost advanced to effectuate the collection of the assets, as confirmed under paragraph 6 subsection 11.B.4, and was and asked to enforce compliance.[47] Pursuant to paragraph 2.b, Medarc had a continued obligation to advance (for later reimbursement) and cover all costs and fees of the debtor during the interim period before the receipt of collections:

*2.b: Advance costs and fees to affect the collection of the AR as reasonably necessary to commence and effectuate collection of the AR.*

81.    Despite notification and request, the Trustee failed to file taxes.[48]

82.    Despite notification and request, the Trustee failed to Comptroller taxes.[49]

83.    The Trustee failed to provide obligatory status updates and collections

---

[47] *Exhibit 45: Revolution Monitoring Bankruptcy - Email Revolution and Trustee Request for Dispute Resolution on Responsibilities Obligated Under the Plan Between MEDARC and Debtor 2-27-20.*

Paragraph 6.11.B.4: *The fourth "B" Payments shall be to Debtors' representative for assistance in the collection of Accounts Receivable not to exceed $35,000.00 in any 12- month period, but continuing each year until the Liquidation Trust is dissolved, this Bankruptcy Case is closed, or collection operations have substantially ceased, and subject to the receipt of proceeds.*

[48] *Exhibit 46: Revolution Monitoring Bankruptcy - Email Revolution and Trustee Re Tax Filing 4-29-20*

[49] *Exhibit 47: Revolution Monitoring Bankruptcy - Email Revolution and Trustee Re State Comptroller 6-29-23 "The trustee must file appropriate returns and pay tax liabilities on behalf of the estate. A trustee who fails to comply with the federal withholding tax provisions runs the risk of being held personally liable for the trust fund taxes not collected and paid over to the government. Similarly, the trustee may be held personally liable when an estate does not have sufficient funds to pay the taxes due from the sale of estate assets." (IN RE: TEXAS PIG STANDS, INC. Debtor TEXAS COMPTROLLER OF PUBLIC ACCOUNTS Appellee v. VINCENT J. LIUZZA, JR., Trustee of Texas Pig Stands, Inc. Appellant).*

updates to the Creditors.[50]

84.    The Trustee failed to do a reasonable job to prevent the devaluing of the

assets, and failed to do a reasonable job to increase the value of the assets for the benefit of

the Creditors; and On 11/12/21, Revolution was informed by the Trustee's hired Collection

Agent, Medarc, that 40% of the assets under the Trustee's management were being

irreparably devalued.[51] Because the trustee failed to respond to the expressed alarm and

concern over the gross mismanagement the assets, responsive to Medarc's report on

11/17/21, at a Status Update Conference Hearing on Revolution's reorganization plan,

Attorney Lindauer preserved on court record, the Creditor's interests in collecting on all the

assets under the management of the Trustee, including the claims of damages from

professional billing negligence and malpractice, caused by its contracted billers.[52] The

hearing also preserved the Creditor's alarming concern that 40% of the assets under the

control of the Trustee were being grossly mismanaged and devalued.[53]

---

[50] *Exhibit 48: Revolution Monitoring Bankruptcy - Email Russ & Trustee Declined Updates 7-22-21.*
*Exhibit 49: Revolution Monitoring Bankruptcy - Email Revolution and Trustee Re Collections Report Request 9-27-23.*
*Exhibit 50: Revolution Monitoring Bankruptcy – John McHallfey Affidavit.*
The trustee falsely represented that he would provide collections updates that he never provided. The creditors relied on his false representation which has now damaged the Creditors: See *Exhibit 52: Revolution Monitoring Bankruptcy - Transcript Status Update Hearing 18-33730-hdh 11-17-2021, p8, lines 5-9, 17-18.*
[51] *Exhibit 53: Revolution Monitoring Bankruptcy - Email Russ & Joyce 40% Loss Update 11-12-21.*
[52] See *Exhibit 52: Revolution Monitoring Bankruptcy - Transcript Status Update Hearing 18-33730-hdh 11-17-2021.*

[53] The Trustee made the following knowingly or recklessly false statements at the 11-17-21 Status Update Hearing and following, which statements were relied upon to the damage of the Creditors:
*"And so the status is good. It's progressing." p5.13.*
*"And fortunately, the Liquidating Trustee has been able to obtain a substantial amount of documents that were -- some not present when we inherited the files of the Debtors." p5.20-23.*
*"In exercising that discretion, he has retained professionals that have expended monumental amounts of time, energy, and resources to conduct discovery and to pursue those claims, and have, in fact, subpoenaed all of the sources of records that are possible, and some that we didn't think possible to begin with. And those subpoenas are being responded to and documents produced." p11.4-10.*
*"As for the third-party billers, we obtained an order in this Court compelling turnover of the documents in their possession. And one party has complied in part, and the estate is pursuing claims against the others to obtain the*

85.    Despite alarming concern and objections raised, the Trustee grossly

mismanaged the production of Revolution's billing appellate records. The Trustee failed to

reasonably enforce subpoenas for appellate records. The Trustee failed to establish a chain-

of-custody with respect to the appellate records. The Trustee failed to depose any prior

contracted billing, appellate, and collections companies or professionals with *subpoena*

*duces tecum*. Upon affirmation and belief, the prior contracted billing companies are still in

possession of material appellate records unproduced by the Trustee. On 3/27/23, the

Creditors received notification from the collection agent for the Trustee, Medarc, that the

Trustee's efforts towards collecting the Trust's assets had been *"mostly a total failure."*[54]

The collection agent indicated that the appellate records of only 8 out of 2,000 claims had

been adequately produced by the Trustee. But if not for the failure of the Trustee to produce

appellate records, the claims would have certainly paid, and the Creditors claims

reimbursed in full respectively.

86.    On 8/11/23 the Creditors discovered that the Trustee had, on 10/27/21,

discharged its assets of claims of damages from professional billing appellate negligence

and malpractice caused by MPS, which is now worth $25,124,989.32, for a completely

inexplicable devalued recovery of $0.[55] When the Creditors asked Attorney Lindauer why

---

*necessary documentation. And so the assets are preserved, and -- and -- and significant value for the benefit of the estate and its creditors." p11.11-18.*
*"The Collection Agent is very actively pursuing and enforcing subpoenas against all known parties that may have possession of documentation regarding the A/R, including former billers. I don't know where the "40%" comes from or what he means by "lost"; however, from my perspective, MedArc inherited records that rendered the A/R almost patently uncollectible and since plan confirmation, has not stopped utilizing all available means to obtain documentation substantiating the A/R and preserving the objective value of those assets."* See *Exhibit 54: Revolution Monitoring Bankruptcy - Email Trustee Denies 40% Loss 11-17-21.*
[54] *Exhibit 55: Revolution Monitoring - MEDARC Collections Agent Email Summary 3-27-23.*
[55] Proving that the Trustee knowingly misrepresented his statement made to the Court: *"And so the assets are preserved, and -- and -- and significant value for the benefit of the estate and its creditors." p11.16-18.*
Both the Trustee and Medarc have confirmed the liability of the asset's prior contracted billing, appellate, and collections servicers with a failure to document obligatory timely appeals:

the collectability of its asset was discharged with no recovery whatsoever, why no notice was provided the Creditors prior to discharge, and why no action was taken on behalf of the interest of Revolution's bankruptcy plan to prevent the devaluing of the asset and neither was any action taken to preserve and increase its value; Attorney Lindauer had no prior knowledge or awareness of the Trustee's discharge of the asset, despite having had an admitted legal obligation to "monitor the Trust."[56] Failure to preserve the Trust's asset is a *Breach of Fiduciary Duty* and *Gross Mismanagement* to the Trust's asset, the reorganization plan, and the Creditors to the Trust. Discharging the Trust's asset with no collected value at all is an additional *Breach of Fiduciary Duty* and *Gross Mismanagement* to Revolution's bankruptcy plan.

87.    On 8/22/23 Attorney Lindauer and Jeremiah Vance conferenced with the Trustee's counsel, Steve Holmes, regarding his email received on 6/13/23 (*Exhibit 75*), where in, Attorney Holmes verifies that the value and collectability of the Trust's assets were directly damaged by the professional record-keeping negligence and malpractice of the asset's prior contracted servicers. Attorney Holmes indicated however, that the Trustee was *not* going to manage the Debtors' assets of claims of damages from professional billing negligence and malpractice, despite confirming in agreement their culpability of negligence in the cause of devaluing the collectability of the Trust's assets. When Attorney Homes was asked to explain the circumstances surrounding the discharge of the Trust's claim of billing malpractice against MPS, that was preserved in Cause No. DC-16-14146, for $0 in collected recovery, he first falsely misrepresented the discharge approval by the former

---

*Exhibit 55: Revolution Monitoring - MEDARC Collections Agent Email Summary 3-27-23.*
*Exhibit 56: Revolution Monitoring Bankruptcy - Email Trustee Verifying Biller Malpractice 1 6-6-23.*
*Exhibit 57: Revolution Monitoring Bankruptcy - Email Trustee Verifying Biller Malpractice 2 6-13-23.*
[56] *Exhibit 58: Revolution Monitoring Bankruptcy - Transcript Motion to Withdraw Hearing 18-33730-hdh 11-21-23, p11.7-8.*

attorney of record in that cause, Gary Kessler. When corrected with the fact that the Trustee

had in fact, discharged the asset, and not the former attorney of record in that cause,

Attorney Holmes then refused to answer any further clarifications on the discharge citing,

"legal privilege."

88.     In the conference, Attorney Holmes raised unspecified and vague "concerns"

about the Statue of Limitations and the billers' liquidity to pay any collection on their

liability of damages from the professional billing negligence and malpractice. But these

seem to be red herrings intended to misdirect from the Trustees' discharge of one of the

Trust's assets, otherwise worth $25,124,989.32, for $0 in collection with no explanation.

Revolution had already preserved claims for billing malpractice against MPS in Cause No.

DC-16-14146, so a Statue of Limitations prohibition would not have applied. Revolution

filed bankruptcy only within about a year from contract termination of its last billing

contractor, so a Statue of Limitations would not have applied either. The same Statue of

Limitations tolling was relied on by the Trustee in his efforts in collecting the Trust's assets

of uncollected medical service claims. Additionally, both the Trustee and Attorney

Lindauer had a fiduciary duty of care to preserve the Trust's assets from damage and Statue

of Limitations discharge. With regard to the billing contractors' liquidity to pay a collection

on a claim, billing and collections professionals are required to keep professional liability

insurance for this very reason, and something— even $1 a claim is still objectively better

than an inexcusable "*total failure*" of $0 a claim.

89.     Additionally, the Trustee seems to have a conflicted self-interest in his

determination of the value and collectability of the Trust's assets. After having inexplicably

discharged one of these assets for $0 in collections, he must now in the self-interested

protection of his own liability for gross negligence, insist that the other assets of billing

contractor liability for failure to document timely appeals, are also worth $0. Otherwise, he

would expose himself to the liability of a breach of fiduciary duty and gross negligence for

having discharged the MPS asset for $0 in collections.

90.    The Trustee grossly mismanaged the billing and collections contract rates he

executed to collect on the assets of the Trust. The Trustee executed billing and collections

contracts far exceeding reasonable industry standard. The Trustee has indicated that the

$1.7 million collected on only 8 of 2,000 claims, is to be awarded in full to administrative

claimants leaving nothing to the beneficiaries of the Trust who now seek remedy.

91.    The Trustee committed gross mismanagement in changing the status of

Revolution's legal representation, exposing the interests of the Creditors, under the

bankruptcy plan to prejudice. Both Revolution and the Reorganized Trust are corporate

entities. As such, Revolution is required to be represented by legal counsel at all times to

maintain standing in court. Without notice nor consent, the Trustee changed the represented

status of Revolution. Attorney Lindauer has testified that Revolution hasn't been

represented by counsel since the inception of its bankruptcy plan.[57] Since Attorney

Lindauer was responsible to monitor the Trust, the Trustee breached his fiduciary duty

when he acted out of a conflicted self-interest in removing his only manner of monitored

oversight and accountability. The Trustee committed gross mismanagement in failing to

object to Attorney Lindauer's *Motion to Withdraw,* leaving Revolution with

unconstitutionally inadequate counsel, and for not retaining an attorney to represent

---

[57] Pursuant to the testimony and pleadings of Attorney Lindauer, Revolution hasn't been adequately represented by counsel during all crucial parts of the bankruptcy plan (*Exhibit 58: Revolution Monitoring Bankruptcy - Transcript Motion to Withdraw Hearing 18-33730-hdh 11-21-23*) and is therefore entitled to *Rule 60* relief for which it now requests.

Revolution at the hearing on Attorney Lindauer's *Motion to Withdraw*. The Trustee has

indicated he will not hire an attorney to represent Revolution at the hearing on his

*Application for Final Decree*.

92.    The Trustee accepted fraudulent Operating Reports from Attorney Lindauer,

who admitted under cross examination testimony at the hearing on her *Motion to Withdraw*

that she filed fraudulent *Operating Reports* on behalf of Revolution.

**Joyce W. Lindauer, PLLC; Joyce Lindauer**

93.    Attorney Lindauer was hired by Revolution, a week before the bankruptcy

plan confirmation, to edit an already created plan, and represent and defend the interests of

Revolution as it pertains to the interests of its bankruptcy plan, and "various matters arising

in this case."[58] Lindauer's Court Order of Employ specifies that: "the payment of all fees

and expenses to Counsel will be subject to approval of the Court."[59] Attorney Lindauer only

submitted one *itemized* Application to *Approve Payment of Fees by Debtor's Counsel*,

which was approved for reimbursement of fees totaling $12,118.28. Leaving a remainder of

$7,881.72 unspent from the original $20,000.00 retainer. Attorney Lindauer fraudulently

tripled her invoice of fees for the two jointly administered Revolution Monitoring

subsidiaries, Revolution Neuromonitoring and Revolution Monitoring Management.

Attorney Lindauer billed Revolution as if she had created three different bankruptcy plans

from scratch. The three Revolution entities are jointly administered under one bankruptcy

plan, which required only one itemization of fees for services. Attorney Lindauer therefore

submitted fraudulent invoicing for the reimbursement of services not in fact preformed.

Additionally, a closer inspection of the itemization of charges listed in Attorney Lindauer's

---

[58] *Exhibit 59: Dkt 102 - App to Employ JWL*
[59] *Exhibit 60: Dkt 131 - Order to Employ JWL.*

Application to Approve Payment of Fees by Debtor's Counsel lists $872.31 in charges related to "subpoena" work that should have been refunded due to work that was done in error requiring later revision by the Trustee's Collections Agent, Medarc. The Creditors now seek recovery of all fraudulently invoiced fees.

94.     Attorney Lindauer admitted by the proffer of the evidence of direct testimony, at the hearing on *Counsel's Motion to Withdraw*, on 12-13-23, that she both billed and accepted payment for services *not* approved by the court, violating her court *Order to Employ*, entitling the Creditors to a judgement of *Contempt of the Court Order to Employ with Sanctions*, which judgement they now seek.[60]

95.     Attorney Lindauer, who had an admitted legal obligation to monitor the trust, failed to enforce the Trustee's compliance with the bankruptcy plan when the Trustee failed to enforce compliance with the plan with respect to Medarc's failure to advance obligatory costs and continue to provide collections status updates. and fees previously mentioned herein, as well as legal fees, and taxes.

96.     Attorney Lindauer failed to enforce the disclosure of obligatory collections reports from the Trustee.

97.     Attorney Lindauer failed to prevent the devaluing of the Trust's assets by the Trustee and failed to ensure the Trustee was increasing the value of the assets for the benefit of the Creditors.

98.     Attorney Lindauer failed to ensure that the Trustee do a reasonably diligent job to enforce the subpoenaed production of asset billing and appellate records.

99.     Attorney Lindauer failed to prevent the devaluing and discharge of asset *DC-*

---

[60] *Exhibit 61: Revolution Monitoring Mail - Attorney Joyce Lindauer Legal Fee Invoice 10-25-21.*

*16-14146* for $0 in collections by the Trustee. After being made aware of the discharge by

the Creditors, and after having been asked for an explanation, Attorney Lindauer filed a

Motion to Withdraw as Counsel wherein she made false statements regarding outstanding

legal fees and conflicts. In hopes of absolving herself of a liability for failure to exercise a

standard duty of care, Attorney Lindauer later proffered evidence in the way of testimony to

the court, at the hearing on her *Motion to Withdraw as Counsel,* arguing the novel pleading

that she had not been the attorney for Revolution since the approval of the bankruptcy plan

on 7/25/19, despite very clearly having been the attorney for Revolution of record from her

court ordered employ until her court granted motion to withdraw. Attorney Lindauer also

admitted to making false statements regarding actually having had represented herself as

Revolution's attorney, multiple documented times in fact, since plan approval. Attorney

Lindauer either fraudulently claimed to be Revolution's attorney when she was not, or she

fraudulently claimed to not be Revolution's attorney when she in fact was. Either way, the

Creditors relied on her fraudulent representation both to act and not to act, which reliance

has now caused the Creditors monetary damages of $89,301,118.92.[61]

100.    Because Attorney Lindauer has proffered the evidence of testimony that she

has not been the attorney of record for Revolution since 7/25/29, then it stands to reason

*prima facie* that she cannot also assert that Revolution was also provided an *adequacy of*

*counsel* at the critical moments of the case, as the first step in determination of *adequacy*

would be the simple agreement between attorney and client that an attorney-client

relationship *does in fact exist*. Since Attorney Lindauer has offered testimony to the fact

that it did not exist, it cannot be argued that Revolution's constitutional rights were violated

---

[61] *Exhibit 58: Revolution Monitoring Bankruptcy - Transcript Motion to Withdraw Hearing 18-33730-hdh 11-21-23.*

by an *inadequacy of counsel* during the critical junctures of the bankruptcy case. As such, the Creditors are entitled to *Rule 60 relief* for which they now ask.

101.    Attorney Lindauer admitted under cross examination testimony at the hearing on her *Motion to Withdraw* that she filed fraudulent *Operating Reports* on behalf of Revolution.

102.    Attorney Lindauer intentionally tried to sabotage the collectability of the Trust's assets by admittedly, refusing to provide ethically obligatory legal opinions and ethically obligatory legal services.

**MedARC, LLC and Russ Lambert**

103.    MedARC, LLC serves as the Collection Agent for Jeffrey H. Mims, Trustee of the Liquidating Trust of Revolution Monitoring, LLC, Revolution Monitoring Management, LLC, and Revolution Neuromonitoring, LLC, pursuant to the Bankruptcy Plan and Plan Supplement. MedARC, LLC is a limited liability company organized in the State of Texas with its principal place of business at 3400 Carlisle, No. 550, Dallas, Texas 75204, which is located in the Northern District of Texas.

104.    The Trustee hired Medarc, LLC as its Collections Agent. Medarc became non-compliant under the plan regarding payments to Revolution's manager and representative in the amount of $2,916.66/month, as a reasonable and necessary cost advanced to effectuate the collection of the assets, as confirmed under paragraph 6 subsection 11.B.4, and was and asked to conform with plan compliancy. Medarc failed its continued obligations pursuant to paragraph 2.b, to advance (for later reimbursement) and cover all costs and fees of Revolution, including legal fees to Attorney Lindauer, during the interim period before the receipt of collections:

*2.b: Advance costs and fees to affect the collection of the AR as reasonably
necessary to commence and effectuate collection of the AR.*

105.    Medarc failed to provide obligatory status updates and collections updates to

the Creditors.[62]

106.    Despite alarming concern and objections raised, the Medarc grossly

mismanaged the production of Revolution's billing appellate records. Medarc failed to

reasonably enforce subpoenas for appellate records. Medarc failed to establish a chain-of-

custody with respect to the appellate records. Medarc failed depose any prior contracted

billing, appellate, and collections companies with *subpoena duces tecum*. Upon affirmation

and belief, the prior contracted billing companies are still in possession of material

appellate records unproduced by Medarc. On 3/27/23, Medarc, notified Revolution that the

Trustee's efforts towards collecting the assets had been "*mostly a total failure*." Medarc

indicated that the appellate records of only 8 out of 2,000 claims had been adequately

produced. But if not for the failure of production of appellate records, all the 2,000 claims

would have certainly paid, and the Creditors claims reimbursed in full respectively.

**McKool Smith and Travis DeArman**

107.    The Trustee hired McKool Smith and Travis DeArman as its Litigation

Agent. Despite alarming concern and objections raised, the Litigation Agent grossly

mismanaged the discovery and production of Revolution's billing appellate records. the

Litigation Agent failed to reasonably enforce subpoenas for the production of appellate

records. The Litigation Agent failed to establish a chain-of-custody with respect to the

appellate records. the Litigation Agent failed depose any prior contracted billing, appellate,

---

[62] Medarc disregarded instructions by the Trustee to continue to provide status updates. *Exhibit 48: Revolution
Monitoring Bankruptcy - Email Russ & Trustee Declined Updates 7-22-21.*
*Exhibit 50: Revolution Monitoring Bankruptcy – John McHallfey Affidavit.*

or collections companies with subpoena duces tecum. Upon affirmation and belief, the prior

contracted billing companies are still in possession of material appellate records

unproduced by the Litigation Agent. On 3/27/23, the Creditors received notice from

Medarc, that the Trustee's efforts towards collecting the assets had been "mostly a total

failure." Medarc indicated that the appellate records of only 8 out of 2,000 claims had been

adequately produced. But if not for the failure of production of appellate records, the claims

would have certainly paid, and the Creditors claims would have been reimbursed in full

respectively.

108.    The Litigation Agent either acted with knowing disregard, or with reckless

disregard for Revolution's constitutional rights of counsel as a corporate entity, and with

knowing or reckless disregard for the prejudice caused the Creditors standing under the

bankruptcy plan when he entered into settlements of the Trust's assets while Revolution

was *inadequately represented by counsel*.  Because Attorney Lindauer has proffered the

evidence of testimony that she has not been the attorney of record for Revolution since

7/25/29, then it stands to reason *prima facie* that it cannot also be asserted that Revolution

was also provided an *adequacy of counsel* at the critical moments of the case, as the first

step in determination of *adequacy* would be the simple agreement between attorney and

client that an attorney-client relationship *does in fact exist*. Since Attorney Lindauer has

offered testimony to the fact of Revolution's *inadequacy of counsel*, it cannot be argued that

Revolution's constitutional rights were not violated by an *inadequacy of counsel* during the

critical junctures of the bankruptcy case. As such, the Creditors are entitled to *Rule 60 relief*

for which they now ask. The Litigation Agent either acted with knowing or reckless

disregard for Revolution's constitutional rights of counsel at all critical junctures of the

case. The Creditors are therefore entitled to *Rule 60 relief* for which they now ask.

### Creditor's Motion for Relief Pursuant to Rule 60

109.    COMES NOW the Plaintiff, Vance, as Creditor and Owner of the Trust, to derivatively on behalf of the Trustee, ask this Court to vacate the Judgements in the following: The Nonsuit discharge with prejudice of Cause No. DC-14-14146; 20-03112-hdh, 20-03113-hdh, 20-03114-hdh, 20-03115-hdh, 20-03116-hdh; and would respectfully show the Court the following:

**The Creditors Motion for Rule 60 Relief Should be Granted Because the Judgements are Void**

110.    Pursuant to Fed. R. Civ. P. 60(b)(4), the Court may relieve a party from a final judgment because the judgment is void.[63]

111.    On June 28th, 2019, the parties entered into a Fourth Modification to Amended Joint Plan of Reorganization Dated March 6, 2019.

112.    On October 27th, 2021, the parties entered into an Order Granting Joint Notice of Nonsuit with Prejudice in Cause No. DC-14-14146.

113.    The parties have entered Settlement Judgements in cases: 20-03112-hdh, 20-03113-hdh, 20-03114-hdh, 20-03115-hdh, 20-03116-hdh.

114.    However, during the 11/21/23 hearing on Counsel's Motion to Withdraw, Attorney Lindauer has argued in pleadings and also proffered the evidence of direct testimony, that she has not been representative for Revolution since the approval of the 1st Plan of Reorganization.

---

[63] Fed. R. Civ. P. 60(b)(4).

115.    Revolution, et al. are corporate entities.

116.    Due to the Attorney Lindauer's admission of the discontinuation of representation, Revolution proceeded either *pro se* or inadequately represented for the balance of the proceedings administered in Cause No 18-33730-hdh. As it stands to reason, that an attorney who denies having been Revolution's attorney, could not have reasonably then provided a legal adequacy of counsel at the same time.

117.    In the Eleventh Circuit, and throughout the sister Circuits, it is well settled that a corporate entity cannot proceed pro se.[64]

118.    Here, both Revolution and the Creditors were prejudiced by the lack of counsel or inadequacy of counsel at the critical phases of the bankruptcy plan proceedings.

119.    Without the aid of counsel, Revolution is now surprised by the irreparably disastrous effects to the Trust's assets that have resulted from judgements made in the above styled cases while Revolution's interests and legal rights under the bankruptcy plan were being prejudiced due to an admitted lack of, or inadequacy of, counsel.

120.    Because Revolution was either not represented or inadequately represented by counsel, and now the effects of the judgements have irreparably damaged the assets of the Trust, as well as the rights of both Revolution and the Creditors under the bankruptcy plan, the Court should vacate all judgments and proceedings adjudicated in Bankruptcy Case No 18-33730-hdh after the Debtors' Second Modification to Amended Joint Plan of Reorganization, resting on established principles of both law and equity.

---

[64] *Lowery v. Hoffman*, 188 F.R.D. 651, 654 (M.D. Ala. 1999) ("numerous courts have made it clear that a non-attorney may not represent a corporation even, where the would be representative is the president, the sole shareholder, or both. . . [t]his is so even where the corporation cannot afford counsel"). See Also *Palazzo v Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir. 1985) ("the rule is well established that a corporation is an artificial entity that can act only through agents, cannot appear *pro se*, and must be represented by counsel.).

**The Creditors' Motion for Rule 60 Relief Should be Granted Because the Judgements are Voidable**

121.    The Court may relieve a party from a final judgment when newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Fed. R. Civ. P. 59(b).[65]

122.    Here, under the prejudice of not being representing by counsel, the Trust's assets were irreparably damaged by ill-advisedly being entered into Settlement Judgements and a Nonsuit with Prejudice Judgment.

123.    Post-Judgments, the Creditors discovered that not all conditions precedent required for the parties to enter into the Judgments had not been satisfied and remained undiscoverable to the Creditors until after the deadline to motion for a new trial had run.

124.    For these several reasons, the judgments are voidable, and the Court should vacate the judgments.

**The Debtors' Motion for Relief from Judgement Should be Granted to the Extent the Consent Judgements Included Attorneys' Fees**

125.    The 6/13/23 Update by the Trustee with respect to the Judgements on the Trust's assets is controlling with respect to the awarding of attorney fees. The relevant part the Update Letter of Understanding provides: *"The Liquidating Trustee will not be able to make distributions to any creditors beyond administrative claimants."* Additionally, Attorney Lindauer continued to invoice and accept payments from the Debtors for attorney fees, in violation of the terms of her 6/21/19 Court Order of Employ which clearly restricts *"the payment of all fees and expenses to Counsel will be subject to approval of the Court;"*

---

[65] Fed. R. Civ. P. 60(b)(2).

both directly and also indirectly through the agreement of reimbursement of Administrative

Fees from collections of the Trust's assets under the Bankruptcy plan.

126. Because Attorney Lindauer did not send written notice of termination to

neither the Debtors nor the Trustee, attorney fees were not entitled to be awarded with

respect to the aforementioned judgments. Therefore, the Court should reform the

aforementioned judgments, awarding all administrative fees to the Creditors of the Debtors'

Bankruptcy Plan.

127. WHEREFORE, for all the foregoing reasons, the Creditor's Motion for

Relief Pursuant to Rule 60 should be granted.

### Creditors' Motion for Contempt of Court and Sanctions

128. COMES NOW the Plaintiff, Vance, as Creditor and Owner of the Trust to

derivatively, on behalf of the Trustee, respectfully request that the Court hold Attorney

Lindauer in Contempt of The Debtors' Court Ordered Application of Employ entered on

6/21/19.

129. Attorney Lindauer has plead in her Amended Motion to Withdraw as

Counsel and also provided the evidence of testimony to the court during the evidentiary

hearing on 11/21/23, that she discontinued the representation of legal services to Revolution

after the bankruptcy plan's initial approval. The Creditors request that Attorney Lindauer be

held in contempt of her court ordered employ.

130. Attorney Lindauer has provided the evidence of testimony to the court

regarding both the invoicing of and accepting of payments that were not court

approved, from Revolution directly, and also indirectly, through Revolution's

agreement of reimbursement of expenses incurred by the Trust. Attorney Lindauer's

Court Order of Employ clearly restricts *"the payment of all fees and expenses to Counsel will be subject to approval of the Court."* Attorney Lindauer violated the terms of her court order in both the invoicing of and the accepting of payments from Revolution both directly and indirectly for fees unapproved by the court. The Creditors hereby request that the Court hold Attorney Lindauer in contempt of the terms of her court ordered employ and be sanctioned with refunding to Revolution all non-court-approved fees received both directly and indirectly.

## CONDITIONS PRECEDENT

131.    All conditions precedent to the Plaintiff's claims for relief have been performed or have occurred.

## CAUSES OF ACTION

132.    Breach of Contract.

133.    Breach of Fiduciary Duty.

134.    Breach of Duty to Care.

135.    Fraud.

136.    Gross Negligence.

137.    Willful Misconduct.

138.    Tortious Interference.

## STATUTE OF LIMITATIONS

139.    To the extent that the statute of limitations would bar any of the Plaintiff's derivative claims, The Plaintiff hereby pleads the discovery rule and/or fraudulent concealment as exceptions to limitations.

## <u>JURY DEMAND</u>

140.    The Plaintiff hereby requests that all claims set out herein be tried by a jury.


*[Remainder of Page Intentionally Left Blank]*

## PRAYER

WHERFORE, PREMISES CONSIDERED,  The Plaintiff prays that, upon final hearing,

they be awarded a judgment for the following relief:

a.       Actual damages;

b.       Disgorgement of profits;

c.       Exemplary damages;

d.       Pre-judgment and post-judgment interest;

e.       Court costs; and

f.       All other and further relief to which the Plaintiff may be entitled.

Dated this 4th day of March, 2024.

Respectfully submitted,

_____s/Jeremiah T. Vance_____
*Plaintiff*
6437 Southpoint Dr.
Dallas, TX 75248
Phone: (214) 228-1257
Fax: (972) 685-0350
jeremiahvance@revolutionmonitoring.com